**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

       v.

AMIT DAGAR,

       *Defendant*.

S1 23 Cr. 319 (ALC)

**DEFENDANT AMIT DAGAR'S SENTENCING MEMORANDUM**

CLARK SMITH VILLAZOR LLP

Patrick J. Smith
Sean H. McMahon
Selbie L. Jason
666 Third Ave, 21st Floor
New York, New York, 10017
(212) 377-0850

*Attorneys for Defendant Amit Dagar*

Dated: July 12, 2024

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

DISCUSSION ........................................................................................................................... 4

I.  Procedural History ............................................................................................................. 4

II.  Amit Dagar's Personal History and Circumstances ........................................................... 6

    A.  Early Life and Upbringing ........................................................................................... 6

    B.  Education ...................................................................................................................... 7

    C.  Career ........................................................................................................................... 7

    D.  Marriage and Family .................................................................................................. 10

    E.  Amit's Character ........................................................................................................ 15

        1.  In Addition to Being a Loving Father and Husband, Amit Is a
           Dedicated Son, Brother, and Friend ................................................................ 16

        2.  Amit Is a Role Model for Others ....................................................................... 19

        3.  Amit's Kindness Extends to His Colleagues .................................................... 21

    F.  Amit Has Shown Tremendous Remorse ..................................................................... 22

III.  The Offense Conduct ....................................................................................................... 23

IV.  The Probation Office's Guidelines Calculation Overstates Gain ..................................... 27

    A.  The Gain Amount Is Inflated ...................................................................................... 28

    B.  Amit Is Eligible for a Downward Adjustment for Acceptance of Responsibility ........... 31

    C.  Proposed Alternative Calculation .............................................................................. 33

V.  A Non-Custodial Sentence Complies with the Purposes of 18 U.S.C. § 3553(a) ................ 33

    A.  Federal Sentencing Framework .................................................................................. 33

    B.  A Downward Variance Is Warranted Under 18 U.S.C. § 3553(a) ................................. 35

        1.  Amit's History and Characteristics Support a Non-Custodial Sentence .................. 35

           i.  Amit's Character and Giving Nature ................................................................ 36

           ii.  The impact on Amit's family, friends, and community ..................................... 38

iii.   Amit's immigration status has unique impacts on his sentence ........................ 42

2.   The Nature and Circumstances of the Offense Favor a Non-Custodial Sentence ...... 47

3.   Sentencing Objectives Under 18 U.S.C. § 3553(a)(2) .................................................. 48

4.   The Need to Avoid Unwarranted Sentencing Disparities and Promote
     Consistency in Sentencing Merits a Downward Variance ......................................... 52

     i.    A non-custodial sentence is consistent with sentences imposed upon similarly
           situated defendants convicted of fraud at trial .................................................... 52

     ii.   The Court should consider the co-defendant's probationary sentence .............. 56

VI.  The Court Should Decline to Order Forfeiture and a Fine .................................................. 58

CONCLUSION ............................................................................................................................. 58

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bordenkircher v. Hayes,*
  434 U.S. 357 (1978)...................................................................................... 57

*Gall v. United States*,
  552 U.S. 38 (2007)................................................................................... 33, 34

*Kimbrough v. United States*,
  552 U.S. 85 (2007)......................................................................................... 33

*Minnesota v. Murphy*,
  465 U.S. 420 (1984)....................................................................................... 57

*Nelson v. United States*,
  555 U.S. 350 (2009)....................................................................................... 33

*United States v. Adelson*
  441 F. Supp. 506 (S.D.N.Y. 2006)................................................................ 35

*United States v. Bakeas,*
  987 F. Supp. 44 (D. Mass. 1997) .................................................................. 45

*United States v. Butler,*
  2011 WL 4073672 (E.D.N.Y. Sept. 13, 2011) ............................................. 38

*United States v. Cavera*,
  550 F.3d 180 (2d Cir. 2008)..................................................................... 33, 34

*United States v. Chin Chong*,
  2014 WL 4773978 (E.D.N.Y. Sept. 24, 2014) ............................ 46, 47, 48, 49

*United States v. Connolly*,
  24 F.4th 821 (2d Cir. 2022) .......................................................................... 44

*United States v. DiAmbrosio*,
  2008 WL 732031 (E.D. Pa. Mar. 13, 2008).................................................. 36

*United States v. DiMattina*,
  885 F. Supp. 2d 572 (E.D.N.Y. 2012) .......................................................... 38

*United States v. Dorvee*,
  616 F.3d 174 (2d Cir. 2010)........................................................................... 34

*United States v. Faiella,*
    2008 WL 4862455 (E.D.N.Y. Sept. 8, 2008) .................................................... 50

*United States v. Ford,*
    320 F. App'x 50 (2d Cir. 2009) ......................................................................... 56

*United States v. Gaind,*
    829 F. Supp. 669 (S.D.N.Y. 1993) .................................................................... 51

*United States v. Howe,*
    543 F.3d 128 (3d Cir. 2008) .............................................................................. 42

*United States v. Jing Wang,*
    2015 WL 1955045 (S.D. Cal. Apr. 29, 2015) .................................................... 28

*United States v. Jones,*
    460 F.3d 191 (2d Cir. 2006) .............................................................................. 34

*United States v. Mooney,*
    425 F.3d 1093 (8th Cir. 2005) ...................................................................... 28, 29

*United States v. Mullings,*
    131 F. Supp. 3d 1 (E.D.N.Y. 2015) ................................................................... 36

*United States v. Rajaratnam*
    2012 WL 362031 (S.D.N.Y. Jan. 31, 2012) ...................................................... 29

*United States v. Rodriguez,*
    2022 WL 158685 (S.D.N.Y. Jan. 18, 2022) ...................................................... 46

*United States v. Saunders,*
    973 F.2d 1354 (7th Cir. 1992) ........................................................................... 57

*United States v. Stewart,*
    590 F.3d 93 (2d Cir. 2009)....................................................................... 48, 51, 52

*United States v. Thavaraja,*
    740 F.3d 253 (2d Cir. 2014).......................................................................... 47, 49

*United States v. Whitten,*
    610 F.3d 168 (2d Cir. 2010).............................................................................. 57

**Statutes**

8 U.S.C. § 1182 .......................................................................................................... 46

8 U.S.C. § 1227 .......................................................................................................... 46

15 U.S.C. § 78j............................................................................................................ 5, 29

15 U.S.C. § 78ff ........................................................................................................ 5

18 U.S.C. § 371 ........................................................................................................ 5

18 U.S.C. § 3553 ................................................................................................ passim

**Rules**

U.S.S.G. § 2B1.4 ..................................................................................... 27, 28, 31, 33

U.S.S.G. § 3E1.1 .......................................................................................... 31, 32, 33

U.S.S.G. § 4C1.1 ................................................................................................. 27, 33

U.S.S.G. § 5H1.6 ...................................................................................................... 40

U.S.S.G. § 5K2.20 ............................................................................................... 48, 53

**Regulations**

17 C.F.R. 240.10b-5 .................................................................................................. 5

We respectfully submit this sentencing memorandum and accompanying letters of support on behalf of Amit Dagar who is scheduled to be sentenced on July 26, 2024. For the following reasons, we respectfully submit that a non-custodial sentence of probation or home confinement is both consistent with the applicable Sentencing Guidelines and appropriate to serve the purposes of sentencing.

## PRELIMINARY STATEMENT

A jury unanimously found that Amit possessed material non-public information about Pfizer in connection with his employment at the time that he purchased stock options in Pfizer on November 4, 2021. Unlike most insider trading cases, which involve planning and deception, Amit's trading in Pfizer stock options was the result of a cascade of mistakes and errors that led to him being exposed to information the jury concluded was material and non-public. Amit did not seek out any information about the Paxlovid trial results or plan and scheme ways to steal Pfizer's confidential information. The better view of the evidence is that Amit was an unintended recipient of information from his supervisor (who had himself mistakenly learned the information and been directed not to share it with anyone else). In that moment, Amit's compulsive and destructive options trading habit—gambling really—took over, and he purchased Pfizer stock options in his own account. His snap decision that day destroyed his career and altered the arc of his life forever.

The circumstances of his unsolicited receipt of material non-public information and his compulsive decision to trade plainly indicate that this offense is far less serious than the typical insider trading case. This factor alone suggests that a non-custodial sentence will be sufficient, but not greater than necessary to accomplish the goals of sentencing.

1

The severity of the collateral consequences of imprisonment, given Amit's immigration status, likewise strongly favors a non-custodial sentence.  As a non-citizen, Amit will be ineligible for designation to a camp under Bureau of Prison procedures and will serve any sentence at a far harsher low-security facility.  Further, as is always the case where aliens are serving a federal sentence, U.S. Immigration and Customs Enforcement will lodge a detainer and place Amit in immigration detention pending deportation proceedings.  A term of imprisonment will lead to an open-ended period of ICE detention under even harsher conditions.  Worse, a sentence of imprisonment will be a strong negative factor in the outcome of any deportation proceedings.  Input from immigration specialists indicates that any sentence over one year will tip the balance and Amit will be deported.  For these and other reasons, a sentence of imprisonment will be a more severe punishment for Amit as a non-citizen than it would be for a U.S. citizen convicted of the same offense based on the same charges and evidence.

Amit has already experienced—and will continue to experience—additional consequences as a result of his actions and conviction.  He has of course experienced the social and reputational damage among his communities in the United States and India, and his health and well-being have declined as a result of the stress, regret, and disappointment he feels for his actions and the ways they have impacted others (and will continue to impact others).  He has lost his livelihood and the specialized career he worked so hard to achieve in order to move to the United States and then to support his wife, daughter, and extended family.  Despite this setback to his career and livelihood, Amit has continued to work hard to provide for his family by partnering with friends to start and grow a private home healthcare business to provide care to senior citizens, veterans, and others in need.  Amit's actions and the conviction have also had a devasting impact on his wife, daughter, extended family, friends, and community.  Amit's wife

now works long hours at her job to financially support their family while Amit is the primary caregiver for their daughter and helps with the home healthcare business. While they are currently able to get by based on his wife's job and their savings, their family is operating in a negative monthly cash flow. If Amit is sentenced to a term of imprisonment, his wife will be required to support them both financially and physically—a very difficult task given that she works long days and does not have family in the United States who can care for their daughter.

Amit's extended family in India—his mother, siblings, nieces and nephews, and in-laws—will also be impacted if he is imprisoned. Although he is his parents' youngest child, he is a beacon for all of them and supports them financially, provides guidance and mentorship to younger family members, and monitors their health from afar. If imprisoned, Amit will lose this connection to his family in India who rely on him. In particular, Amit will be prevented from supporting his mother who lives in India and ███████████████ as well as his mother-in-law and father-in-law ████████████████████ ███.

Despite this impact on Amit's family, friends, and communities, he has not lost their support. As anyone who knows Amit would agree, this is not surprising as Amit is an exceptionally kind and jolly man who does everything he can to help those around him and protect his family. The 43 letters accompanying this memorandum from Amit's family and friends universally show that these characteristics are the essence of Amit's character and that this offense and Amit's actions, for which he takes responsibility, were an anomaly in the life of a man who otherwise has led a law-abiding life, been grateful to live and work in the United

States, and respected the laws and rules of the United States.[1]  These letters overwhelmingly show that Amit is a selfless, kindhearted, compassionate, and generous man who is willing to help anyone he can and prioritizes his family above all else.  Being a husband and a father to his wonderful wife and daughter are the most cherished roles in his life, and his biggest concern now is how any sentence will impact them.

The Sentencing Guidelines, intended to aid the Court as it gauges the severity of the offense conduct, are a tool ill-suited to determining an appropriate sentence in this case.  Tellingly, despite the Probation Office's Guidelines calculation, they recommend a significant downward variance from 27 to 33 months' imprisonment to 15 months' imprisonment—half of the term of imprisonment under the Guidelines calculation.  While we appreciate the thought and care that went into this recommendation, we submit that it does not adequately reflect both the lower level of seriousness of this offense compared to typical insider trading cases, as well as the harsh impact of a sentence of imprisonment on Amit as a non-citizen.

We respectfully request that the Court impose a non-custodial sentence of probation or home confinement which will be sufficient, but not greater than necessary, to accomplish the goals of sentencing.

## DISCUSSION

### I.  <u>Procedural History</u>

On June 28, 2023, a federal grand jury in the Southern District of New York returned an indictment against Amit Dagar and Atul Bhiwapurkar.  ECF No. 1.  Amit and Mr. Bhiwakpurkar

---

[1] Amit's letter to the Court is attached as Exhibit A, and his wife's letter to the Court is attached as Exhibit B.  The letters in support of Amit from family and friends are attached as Exhibit C.

were both charged with one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 (Count One). Amit was also charged with four counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. 240.10b-5 (Counts Two to Five), and Mr. Bhiwapurkar was charged with two counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. 240.10b-5 (Counts Five and Six). The original Indictment alleged, in sum and substance, that Amit engaged in insider trading on November 4, 2021 by purchasing options in Pfizer Inc. ("Pfizer") while in possession of material non-public information learned during his employment at Pfizer regarding the results of an efficacy study of Pfizer's drug, Paxlovid, and then conspired with Mr. Bhiwapurkar to do the same by recommending that Mr. Bhiwapurkar trade in Pfizer securities. ECF No. 1 ¶ 1.

The government superseded the Indictment on December 13, 2023, less than one month before trial. ECF No. 46. The superseding Indictment removed Mr. Bhiwapurkar as a defendant, condensed the original securities fraud counts into one count (Count One), and kept the conspiracy to commit securities fraud violation (Count Two). The superseding Indictment alleged that Amit was a Pfizer employee who worked on the Paxlovid clinical study, learned information on November 4, 2021 about the "the results of the relevant [Paxlovid] study" and that "there would be a press release about the trial's results the following day," and purchased call options for Pfizer stock on November 4, 2021. *Id.* ¶¶ 7-9, 11, 13. The superseding Indictment further alleged that Mr. Bhiwapurkar purchased options in Pfizer stock after "having been tipped" by Amit. *Id.* ¶ 23.

Trial began on January 9, 2024. The government rested on January 16, 2024. Amit moved for a judgment of acquittal under Rule 29(a) as to both Count One and Count Two which the Court denied. Amit put on a brief defense case-in-chief consisting of one witness to

authenticate summary charts.  Closing arguments took place on January 16 and 17, 2024.  On January 18, 2024, the jury returned a verdict of guilty as to Count One (securities fraud) and Count Two (conspiracy to commit securities fraud).

On February 8, 2024, Amit moved for a judgment of acquittal under Rule 29(c) with respect to Count One, Count Two, and venue which the Court denied on May 23, 2024.

## II.    Amit Dagar's Personal History and Circumstances

### A.  Early Life and Upbringing

Amit was born in Rohtak, India on July 4, 1979.  Presentence Investigation Report ("PSR") ¶ 52 (ECF No. 119).  He was raised in Nagpur, India, where he lived in a two-bedroom apartment with his parents and two older brothers, with whom he shared a room until he moved out at the age of 19.  *Id.* ¶ 54.  Amit's father was a teacher at a physical education college and his mother was a homemaker.  *Id.* ¶ 52.  The Dagar family was working-class and lived paycheck to paycheck.  *Id.* ¶ 54.  Growing up, Amit played sports, spent time playing outside or watching television, and spent time with friends.  *Id.* ¶ 55.

Amit's parents were married for 49 years before his father passed away ███████ ███ in 2019.  *Id.* ¶ 52.  Amit's mother is 73 years old and still resides in India.  *Id.*  Despite their physical distance, Amit maintains a very good relationship with his mother, and they are in contact multiple days a week.  *Id.*  Amit's mother ██████████████████ in 2020 and, as a result of her ███████████, Amit has not informed his mother about this case.  *Id.*  But Amit writes that "[w]e will have to tell her soon and I am scared it will break her and don't know how she will manage."  A. Dagar Letter, Ex. A at 4.  Troublingly, four of Amit's maternal uncles have passed away ████████████████.  PSR ¶ 52.  Should Amit be imprisoned, he would not be able to contact his mother and ████████████████████, nor would he be able to help if

██████████████████████████████████.  *Id.*  Amit's wife writes that "[o]ur biggest fear is that if Amit has to go away sometime and he won't be able to talk to them we will have to tell them about what is going on and with them being old and ████████████████ we are worried how it would affect them and that it will take a toll on their health."  S. Dagar Letter, Ex. B at 2.

### B. Education

Amit attended Bhavan's BVM high school in India and received his diploma in 1997.  PSR ¶ 73.  Following high school, Amit attended Nagpur University in India and graduated in 2001 with a bachelor's degree in engineering.  *Id.* ¶ 74.  Amit immigrated to the United States in 2003 via a student visa, seeking better job opportunities and a better life.  *Id.* ¶ 56.  He attended the University of Texas and received his master's degree in electrical engineering in December 2004.  *Id.* ¶ 74.  Amit has always been a dedicated student.  As he writes, "I was in no way from a rich family so have to work hard to support myself here."  A. Dagar Letter, Ex. A at 1.  During graduate school, Amit lived with friends in Arlington, Texas.  PSR ¶ 61.  His friends describe him as a roommate who "consistently went above and beyond for others, earning our reliance on him for many things."  A. Turang Letter, Ex. C at 1.

### C. Career

In 2006, Amit began working for Eliassen Group, a consulting firm that does contract work for Pfizer.  PSR ¶¶ 57, 77.  Amit worked full-time as a programmer and was eventually promoted to the position of associate director.  *Id.* ¶ 82.  Throughout his 12-year career at Eliassen Group, all of Amit's work was on Pfizer projects.  *Id.*  He left Eliassen Group in July 2018 for a position working at Pfizer itself.  *Id.*  Amit joined Pfizer as a full-time senior manager that same month, eventually earning the role of senior statistical programming lead.  *Id.* ¶ 81.  After nearly five years working at Pfizer, Amit was terminated Amit in January 2023 in

connection with this case.  *Id.*  Amit worked quickly to get back on his feet, and he was able to

secure a job as a director of statistical programming with BioNTech U.S.  *Id.* ¶ 80.  Amit began

his new job at BioNTech U.S. on June 26, 2023.  *Id.*  However, he was terminated on June 30,

2023 following his indictment and arrest in this case.  *Id.*

Amit's former colleagues describe him as "a great mentor" and "a great leader" who "led

the team with a great management style" and "was instrumental in the success of the entire

project."  A. Bansal Letter, Ex. C at 4; B. Makkapati Letter, Ex. C at 11; N. Pandya Letter, Ex. C

at 30; *see also* P. Gade Letter, Ex. C at 35 (Amit has "been a mentor to me and guided me to take

up challenges and grow in my career."); V. Burla Letter, Ex. C at 60 ("Amit was not only our

manager at work but a mentor and a guide who was always there for me and the team.").

According to one former co-worker, "Amit is an incredibly loyal and always smiling individual

who consistently goes above and beyond to assist his colleagues with both work-related and

personal matters. . . . Throughout my 16-year association with Amit, I have witnessed firsthand

the unwavering trust and respect that his colleagues hold for him."  H. Patel Letter, Ex. C at 17.

Another former co-worker recalls that "Amit was extraordinarily bright and a bundle of joy to be

around for the whole Eliassen office," where he "was very hardworking and dedicated to his

work."  S. Saranga Letter, Ex. C at 47.  Similarly, another former co-worker states that when he

first started at Eliassen Group, Amit "mentored me through my initial training and, when needed,

provided me with additional aid to help understand my work better.  All through my initial days

at work, Amit provided me with unwavering support and always made sure that I was

comfortable and confident in my role."  V. Burla Letter, Ex. C at 60.

Amit was always "very helpful at the office during project submission times.  He even

helped colleagues personally during their hard times."  S. Paladi Letter, Ex. C at 43; *see also* V.

Burla Letter, Ex. C at 60 ("Amit also went above and beyond what his role as a manager demanded to help his colleagues."). Amit's kindness as a colleague extended beyond those he supervised. *See* T. Juluri Letter, Ex. C at 57 ("While [Amit] was not my immediate supervisor, he took the time to welcome me to the workplace, introducing me to other colleagues and making me feel at home. Despite his busy schedule, he always made himself available for guidance and support, even extending the offer for assistance beyond his direct responsibilities.").

Despite the recent setbacks in this career, Amit remains committed to securing employment in order to provide for his family. He is currently in the process of starting a private home health care business, which would provide care to senior citizens, veterans, and others in need. PSR ¶ 79. According to Amit,

> We are taking a different approach to help the community, especially seniors, and trying to provide the care and respect they deserve. We are hoping with this initiative we can make a difference in at least a few people's life, give them hope, let them know that they are not alone and there are enough good people around.

A. Dagar Letter, Ex. A at 2-3. As Shruthi writes, Amit "is remorseful for this act which led to this incident, and he gathered courage and strength and this time he wanted to do something to help and serve the community in some way as a form of his chance to make amends. So, he joined hands/partnered with our friends and worked on starting a home healthcare business which he has been working on with his full commitment and dedication." S. Dagar Letter, Ex. B at 1-2. Amit's business partner in this endeavor also describes Amit's dedication to this new business:

> Even at a time like this, he has found the heart to work alongside me in our new initiative of starting up a home care agency. He sees the value in providing care for our seniors and has been putting in all of his efforts in getting the agency started and making himself available for anything that needs to be accomplished in the process so that we can start serving our

> community at the soonest. He has been integral in getting us off the
> ground . . . .

P. Chhetri Letter, Ex. C at 34. However, the guilty verdict in this case has complicated

the process of starting the business, and he will lose this opportunity to be gainfully

employed and provide for his family if he is imprisoned. PSR ¶ 79.

### D. Marriage and Family

Amit met Shruthi Dagar, née Mettu, while they were both working at Eliassen Group in

2006. *Id.* ¶ 57. Amit was living alone in Groton, Connecticut at this time, and Shruthi lived one

block away. *Id.* ¶ 60. Amit and Shruthi were initially friends, but they began dating in 2008 or

2009. *Id.* ¶ 57. In 2016, they moved in together to a house in Hillsborough, New Jersey and got

married in August 2017. *Id.* ¶¶ 57, 59. Amit and Shruthi still reside at the same home in

Hillsborough. *Id.* ¶ 59.

Shruthi describes that Amit's "good heart, helping nature, care and concern for others,

hardworking nature, selflessness, [and] loyalty are some of the positive qualities [t]hat made me

want to spend the rest of my life with him. These last 18 years since I have met Amit, he proved

himself to be a best friend and a wonderful husband to me and a loving father to our 4-year-old

daughter M█." S. Dagar Letter, Ex. B. at 1. Amit describes Shruthi as a "pure soul" who he

has "never seen angry or unhappy with anyone" and that, more recently, "she is working so hard

to keep this family afloat." A. Dagar Letter, Ex. A at 3. As a couple, a friend describes that they

> both looked adorable together and we could see the glow in [their] eyes as they
> waited several years to get bonded in marriage as it was difficult to convince his
> parents as he comes from an orthodox family. . . His parents visited from India
> and were very happy to meet Shruthi who is a sweet heart, kind, calm and full of
> peace. She is such a good wife who only cares about peace for the family and
> nothing more than Amit except his love.

K. Burle Letter, Ex. C at 22.  Shruthi writes that "I have forgiven my husband and together as a family we are working on making things right," and she attended the entirety of the trial in this case.  S. Dagar Letter, Ex. B at 2.

Shruthi is employed by Johnson & Johnson as a computer programmer, where she works full-time, and she is the family's sole source of income at this time.  PSR ¶ 57.  Shruthi is ███████████████████████████████████████████████████████████████████ when she and Amit first began dating.  *Id.*  During the trial in this case, Shruthi also ██████ █████████████████████ which even required her to see a doctor.  *Id.*  Shruthi's parents have a ██████████████████████████████████, and her mother has had ████████ ██████████████████████.  *Id.*  If Shruthi's parents require assistance or suffer from ██████ ██████████, and Amit is imprisoned, the responsibility for caring for them will fall entirely on Shruthi who is working full time to support their family.  *Id.*  Of course, if Shruthi herself █████████████████████████████████, Amit would be unable to help if imprisoned.  Amit adds, "I am scared that if I am not around then it will also affect [Shruthi's] health.  I can't even imagine if something happens to Shruthi then how I can live with myself." A. Dagar Letter, Ex. A at 3.

On October 26, 2019, Amit and Shruthi welcomed their daughter, M██, into the world. M██ is now four years old and is, in Amit's words, "everything for him" and he "loves her to death."  PSR ¶ 58.  As Amit writes in his letter to the Court, "[m]y daughter for me is everything, her one smile and I can give everything that I have."  A. Dagar Letter, Ex. A at 2.  Amit's sister-in-law writes that, for Amit, "the universe exists in the sparkle of his daughter's eyes."  M. Dagar Letter, Ex. C at 28.  One friend relates that "M██ is simply Amit's world and equally she is a daddy's girl who shares a very special and irreplaceable connection that shapes M██'s life in

profound ways." S. Pall Letter, Ex. C at 41. "M███ looks forward to Amit coming home when he is not around and no matter how much fun she has with her mother or others around her. Amit is her role model, and she is so emotionally dependent on Amit that her day starts and ends with Amit." *Id*.

Shruthi describes Amit as a very good father. PSR ¶ 62. She writes: "Amit is a wonderful father to our 4-year-old daughter. He loves her more than anything and since this incident he has taken care of her more than me as I was busy with work. . . . I cannot ask for a better father for our daughter than Amit." S. Dagar Letter, Ex. B at 2. Amit's brother says that Amit "actively participates in every aspect of their daughter's upbringing, ensuring she feels loved and cherished." R. Dagar Letter, Ex. C at 39. As one friend puts it, Amit "approaches fatherhood with a sense of responsibility and devotion that is truly admirable." A. Bansal Letter, Ex. C at 3. Another friend reports that "I have seen [Amit] actively and immensely involved in bringing up his daughter from the day she was born. The love and affection they have for one another is palpable." A. Bhanose Letter, Ex. C at 5.

As shown over and over again in the letters of support accompanying this memorandum, Amit is "a great family man and an even better father to his daughter." B. Makkapati Letter, Ex. C at 11; *see also* H. Kothikar Letter, Ex. C at 19 (Amit is "a loving husband and a devoted father"); K. Burle Letter, Ex. C at 22 ("Unquestionably, [Amit's] wife and family are the most important things in his life."); P. Gade Letter, Ex. C at 36 ("[Amit] is a loving husband, a doting father."); R. Chamala Letter, Ex. C at 40 ("Mr. Dagar is a committed family man."); S. Chhetri Letter, Ex. C at 48 (Amit is "a caring and concerned husband and father."); S. Turang Letter, Ex. C at 49 ("I am deeply impressed by Amit's love, dedication, and devotion to his young family, particularly his daughter."); S. Manchiraju Letter, Ex. C at 50 ("He [] is very loving and

supportive to his wife and an amazing father."); A. Rana Letter, Ex. C at 9 (Amit "embodies the essence of a devoted family person.").  Simply put, "Amit is a cornerstone of the family and a source of emotional strength and guidance for both Shruthi and M█████."  M. Dagar Letter, Ex. C at 28.

Amit is a hands-on father and, with Shruthi working full-time, he is also M███'s primary caregiver.  PSR ¶ 58.  He gets her ready for daycare, prepares her food, and takes her to and from daycare.  *Id.*  Amit takes immense joy in caring for their daughter.  Shruthi writes that Amit

> does pretty much everything around the house to help me out and he does everything for our daughter from getting her ready to school, dropping her off and picking her up at school, playing with her, reading to her, taking her out to parks and events, tucks her in bed and reads to her to make her sleep at night.

S. Dagar Letter, Ex. B at 2.  According to Shruthi's cousin, "Amit is a hands on parent who is actively engaged in his 4-year-old daughter's daily routine.  From getting her ready for day care, playtime, mealtime to bedtime, I have always seen Amit involved in one way or another with her throughout the day."  B. Reshaboina Letter, Ex. C at 12.  Amit's brother-in-law states: "[Amit] is a very involved father to his four-year old little girl. . . . I have seen him spend his evenings playing with her, cuddling together on the sofa while watching children's movies, listening to old Hindi songs as he gives her a shower, and dancing together on new Bollywood songs."  N. Vaddepalli Letter, Ex. C at 29.  "It is common to see [Amit] sitting down with his child, playing games with her, joking with her, and always displaying so much love and affection to her."  N. Desai Letter, Ex. C at 32.  "From waking her up, to feeding her, dropping her to school, silly day to day endless conversations, playing with her, picking her from school, combing her hair, going out to playgrounds, backyard play, putting her to bed daily, giving her baths and putting up with her countless tantrums are just few day-to-day that connects both together."  S. Pall Letter, Ex. C at 41.

Amit does his best to "keep a happy face" for M█████ so she does not know something is wrong, but it is very difficult. PSR ¶ 58. If Amit is imprisoned, Shruthi will have to be M███'s primary caregiver while working a full-time job as the family's sole source of income. Amit notes that "[s]ometimes [Shruthi] is working 18 hours a day just to keep her job. It's a very competitive industry and every company is trying to cut costs. And with our situation if we lose her job then we won't be able to survive." A. Dagar Letter, Ex. A at 3. Shruthi writes:

> I have a full-time job which I need to keep at any cost with our current financial situation and if Amit is not around for an extended period it would make mine and our daughter's life very difficult. I have my own fears about who would take care of my daughter if I am ill or something else goes wrong with me for a brief period in Amit's absence. We would be equally punished staying away from Amit as Amit would be staying away from us.

S. Dagar Letter, Ex. B at 2.

Needless to say, M████ would suffer enormously from having her father imprisoned, especially during these formative years. Shruthi worries that "[a]nytime away from [Amit] she will greatly miss him, and it will leave a great vacuum in her life, and she is at an age where she cannot understand why she must stay away from her father" and while M███ "is little now [] we worry in future how it will affect her knowing about her father's imprisonment. . . . [O]ur daughter didn't do anything to deserve to be away from her father who she is very dependent on." *Id.* Shruthi's brother relates that "I am also concerned about the challenges my sister would be facing in raising her daughter in her husband's absence." D. Mettu Letter, Ex. C at 13. "Any harsh punishment to Mr. Amit will be detrimental not only to him emotionally but will turn the fortune of his nuclear family upside down. The mental trauma on his wife and only daughter would be unbearable." S. Katariya Letter, Ex. C at 45-46. Amit's "absence would leave a significant void in the lives of his 4-year daughter and wife. Of particular concern is Amit's young daughter, at such a tender age, she is ill-equipped to comprehend or navigate the

complexities of an adverse situation in the absence of her father's guidance and support." S.
Dagar Letter, Ex. C at 56.

### E. Amit's Character

To assist the Court in considering Amit's full character, we have submitted 42 letters in
support of Amit written by extended family, friends, co-workers, and those who have benefitted
from or witnessed Amit's incredible kindness. *See* Ex C. Letters from Amit and Shruthi also
accompany this memorandum. *See* Exs. A-B. We could not possibly recount here all of the
good deeds and kindnesses Amit has performed throughout the course of his 45 years, which
continue to the present day, even during and after his trial.

The letters accompanying this memorandum uniformly paint a picture of Amit as a man
of great compassion, generosity, and loyalty. *See, e.g.*, R. Dagar Letter, Ex. C at 39 (Amit has a
"boundless capacity for compassion, resilience, and selflessness."); S. Dagar Letter, Ex. C at 44
("[Amit] is a very compassionate, empathetic and generous person."); A. Turang Letter, Ex. C at
1 ("I have witnessed Amit demonstrate his integrity and compassion as a husband, father, friend,
and member of our community."); A. Bansal Letter, Ex. C at 3 ("He has consistently
demonstrated loyalty, compassion, and understanding."); A. Vaddepalli Letter, Ex. C at 7
("[Amit] goes out of his way to be good, do good, help anyone and everyone, in every way he
can."); A. Vaddepalli Letter, Ex. C at 8 ("I was in absolute awe several times to see how
extraordinarily generous and kind a person could be. [Amit] is a great husband, a devoted father
and one of the most compassionate human beings."); B. Reshaboina Letter, Ex. C at 12 ("Amit is
extremely caring, selfless and giving."); N. Vaddepalli Letter, Ex. C at 29 ("[I]f I had to pick one
word to describe [Amit], it would be generous."); N. Pandya Letter, Ex. C at 30 ("I have always
found [Amit] a very outgoing and compassionate person."); R. Desai Letter, Ex. C at 37 ("Amit

has always proved to be a very giving, selfless person who loves to help others. . . .  As a father

and friend, he is both compassionate and loyal."); S. Paladi Letter, Ex. C at 43 ("Amit [is] a very

kind, thoughtful and generous person."); S. Saranga Letter, Ex. C at 47 ("Amit is one of the most

caring, selfless, and kind human being."); S. Chhetri Letter, Ex. C at 48 (Amit is "a thoughtful

and generous friend."); S. Manchiraju Letter, Ex. C at 50 (Amit "is one of the most kind, helpful

and understanding person I have met."); S. Kanagala Letter, Ex. C at 51 (Amit "has consistently

shown unwavering support, compassion, and empathy towards us during both joyous occasions

and challenging times."); S. Kanagala Letter, Ex. C at 51 ("[T]he essence of [Amit's] character .

. . is rooted in kindness, empathy, and selflessness."); T. Juluri Letter, Ex. C at 57 ("Amit is the

epitome of reliability and compassion."); V. Burla Letter, Ex. C at 60-61 ("[Amit] is a kind,

compassionate, and a warm person who would go out of his way to help people."); M. Rana

Letter, Ex. C at 24 ("[Amit] is an exceptional human being and a rare noble soul."); M. Dagar

Letter, Ex. C at 27 ("[Amit] is a pure and noble soul."); R. Dagar Letter, Ex. C at 38 ("[Amit] is

a paragon of integrity, kindness, and unwavering support.").

### 1.  In Addition to Being a Loving Father and Husband, Amit Is a Dedicated Son, Brother, and Friend

Kawleen Oberoi, who testified for the government, stated during trial: "I think Amit is a

very fine individual both personally and I think he is a very conscientious person when it comes

to the professional work environment. . . . [H]e is a nice, he is a terrific individual."  Tr. 279:3-

279:11.  Mr. Oberoi's emotion when testifying as to Amit's character, based on how difficult it

was for him with Amit in the room, was palpable.  These feelings by Amit's extended family and

friends are universal.  Amit never fails to help family and friends, especially in times of need.

During his brother's "███████████████, [Amit's] calming presence and heartfelt

assurances provided solace amidst uncertainty."  R. Dagar Letter, Ex. C at 38.  And when the

same brother and his wife ███████████████ in India, "Amit's support was a lifeline from afar." R. Dagar Letter, Ex. C at 38. Amit's brother explains that "Amit's dedication to our father's well-being during his ████████████ was extraordinary." *Id*. M████ was born in New Jersey only three weeks before Amit's father passed away in India. Nevertheless, Amit "immediately flew to India, shouldering the responsibility of performing the last rites and offering unwavering support to our grieving family." *Id*. As his sister-in-law says, "[d]espite welcoming the first newborn into his own family, his lovely daughter M███, just days before he made the journey to India to bid farewell to his father, offering solace to his grieving mother and siblings." S. Dagar Letter, Ex. C at 55.

The letters we have submitted are replete with examples of Amit doing everything he can to help those around him. Shruthi "can name so many instances where [Amit] went out of his way to help someone whether it's our family member, friend or anyone in the community where we live." S. Dagar Letter, Ex. B at 1. Amit's sister-in-law in India says that, ████████████ ████, "Amit took utmost care of me ████████████ and helped me recover both physically and mentally." M. Dagar Letter, Ex. C at 27. When one friend was ████████████ without family support, Amit immediately drove from Connecticut to New Jersey to be with that friend and care for him. Even during his trial in this case, Amit "did everything he could to comfort" his brother-in-law who had fallen "████████████." A. Vaddepalli Letter, Ex. C at 7; *see also* A. Turang Letter, Ex. C at 1-2. Amit's "nature is to reach out help to maximum extent possible. Be it helping our neighbors to help clear the snow, so they could take their kids to school on next day. Or accompany a friend to a doctor's appointment on a snowy day." S. Manchiraju Letter, Ex. C at 50. Shruthi confirms that "I never see him doing snow blowing off our sidewalk only. We have a couple of older neighbors on both sides of our house and whenever it snows, he will

wake up early and make sure he cleans our sidewalk and both our neighbors." S. Dagar Letter, Ex. B at 1.

Amit truly is the first person his family and friends call when they are in need, and with good reason. Amit "epitomizes the saying 'a friend in need is a friend indeed.'" A. Bhanose Letter, Ex. C at 5. When Amit's future brother-in-law first arrived in the United States for graduate school and found that his accommodations were not secured, he says Amit "immediately drove to Connecticut from New Jersey to pick me up late in the night. When he dropped me back, he ensured I was in safe and secured place on-campus and constantly kept in touch during the initial couple months." A. Vaddepalli Letter, Ex. C at 8. The same brother-in-law, who █████ while staying at Amit's home during the trial in this case, says Amit "was the first person I could think of during my ██████." A. Vaddepalli Letter, Ex. C at 7.

This generosity is not limited to family members. A former co-worker relates that "[w]hen I lost my job during Covid and had to vacate my apartment, [Amit] welcomed me into his home, where I lived for eight months." N. Vaddepalli Letter, Ex. C at 29. Another friend says that Amit helped him with the down payment for a new house and even helped build his basement when he moved in. *See* S. Chhetri Letter, Ex. C at 48. When Amit's friend's wife was ████████████████████████████████████████████████████████, "Amit emerged as a beacon of hope and support. His presence during ████████████████████ ████████████████████████████████ itself was a source of immense comfort." S. Kanagala Letter, Ex. C at 51. Similarly, "[w]hen a mutual friend's spouse faced a battle ████ ████████████, Amit was there without hesitation, offering his assistance and support in any way possible." *Id*.

The majority of the letters accompanying this memorandum demonstrate that Amit's generosity, kindness, and desire to give back are not isolated incidents. *See, e.g.*, S. Turang Letter, Ex. C at 49 ("Amit has been a loyal friend, someone I can rely on in times of emergency. . . . One of Amit's most admirable traits is his willingness to help without being asked."); B. Reshaboina Letter, Ex. C at 12 (Amit "is the first person I reach out to in my time of need."); R. Desai Letter, Ex. C at 37 ("Amit is the kind of person you can call during the best of times, or the worst of times and he remains kind, calm, and insightful."); Z. Patel Letter, Ex. C at 62 ("[Amit] is a beacon of support and reliability, a steadfast presence in both times of celebration and moments of adversity."); U. Patel Letter, Ex. C at 59 (Amit makes "spontaneous volunteering efforts to help others.").  A. Rana Letter, Ex. C at 9 ("[Amit's] genuine interest in the well-being of others, coupled with his unwavering support, makes him a pillar of strength in times of need."); Z. Patel Letter, Ex. C at 62 ("Whether it's coming to the rescue on a deserted highway, aiding in the daunting task of relocating, or offering transportation when none is available, [Amit] has consistently demonstrated his reliability and dependability."); M. Dagar Letter, Ex. C at 27 ("I have seen Amit always financially helping out his cousins and friends in their hour of need."); S. Katariya Letter, Ex. C at 45 ("Amit enjoys a reputation of someone who extends a helping hand irrespective of the time of the day or his personal commitment."); S. Dagar Letter, Ex. C at 55 (Amit's "generosity extends beyond his immediate circle, as he tirelessly supports those in need, whether it's helping a widow rebuild her home or providing education to a child orphaned by the pandemic.").

## 2. Amit Is a Role Model for Others

Not only does Amit do everything for his own wife and daughter, he is also a role model for the children of his family members and friends.  Amit "has assumed the role of mentor and

confidant to [his nephew] Sanskar, offering invaluable guidance and counsel on matters of academia and higher education." R. Dagar Letter, Ex. C at 38. Amit's sister-in-law states that "[h]is compassion and humility left an indelible mark on our children, who learned invaluable life lessons simply by observing him." S. Dagar Letter, Ex. C at 55. The son of one of Amit's neighbors says that, after he graduated college, it was Amit who "provided me with much needed advice and gave me the courage to pursue my dreams and join the United States Military. I now get the honor of calling myself a commissioned officer and much of this is due to the wisdom and fearlessness instilled upon me by Mr. Dagar." R. Chamala Letter, Ex. C at 40; *see also* S. Pall Letter, Ex. C at 41 (Amit is "an exemplary role model for everyone in his immediate and extended family and friends."); A. Rana Letter, Ex. C at 9 (Amit is "not only a beloved relative but also a role model worth emulating."); M. Rana Letter, Ex. C at 24 ("[Amit] is a source of inspiration for all the youngsters in our relations and friends' circle."); S. Dagar, Ex. C at 56 ("[Amit] is not just an exemplary son and father but also a mentor and role model to many.").

One instance of Amit's dedication to the children of friends and family members stands out. The Chhetri family has known Amit since Sharad Chhetri began working with Amit almost 20 years ago. Sadly, their six-year-old daughter was ███████████████ in 2016. Amit did everything he could to care for his friends and their daughter during this immensely difficult time. According to Sharad Chhetri, "Amit has always treated our daughter as his own and was there for her as much as I to support and take care of her. His unconditional love and support for me and my family is something I will never forget and am forever in debt." S. Chhetri Letter, Ex. C at 48. Others have echoed these sentiments. *See* L. Chamala Letter, Ex. C at 23 ("My friend's daughter was ███████████████ a few years ago. Amit and his spouse frequently spend nights in the ███████████████, cooking, and dropping off and picking up family

members."); A. Bhanose Letter, Ex. C at 5 ("When our close friend's 4-year-old daughter was ███████████████████, Amit and Shruthi were there with all the support they could give throughout her ██████████████████. They were there in the ████████ when needed, brought home cooked food for parents, and ran any errands needed for them.").

### 3.  Amit's Kindness Extends to His Colleagues

On the professional front, Amit was a beloved co-worker and manager who supported everyone around him, both inside and outside of work.  When a new co-worker started at Eliassen Group and felt overwhelmed, "[d]espite having prior commitments, Amit selflessly dedicated extra time after office hours to sit with me, ensuring the timely completion of our deliverables."  V. Burla Letter, Ex. C at 60.  A co-worker whose father suffered a ████████ ██████ that required him to return to India states that Amit "willingly took on my responsibilities himself" and "even went the extra mile by regularly checking in with me."  H. Patel Letter, Ex. C at 17.  The same co-worker states that "[t]hroughout my 16-year association with Amit, I have witnessed firsthand the unwavering trust and respect that his colleagues hold for him."  *Id*.  Another co-worker states that "one of my colleagues went through a difficult ████████ and Amit went out of his way to help their family during the whole time."  S. Paladi Letter, Ex. C at 43.

Amit is also actively involved in charity work.  He works with the Janta Rehabilitation Training Centre for the Visually Handicapped, which assists "special need individuals[,] mainly blind."  N. Sharma Letter, Ex. C at 20.  Its Joint Secretary writes that Amit has been "associated with us for the last 4 years.  He is an active member to help us physically, mentally and financially."  *Id.*

### F.  Amit Has Shown Tremendous Remorse

Amit recognizes that he is responsible for his conduct.  Amit writes: "Every second I feel remorse and regret about my actions.  I can still live with what happens to me, but I just cannot get over the fact that my actions have and will change my wife's and daughter's life."  A. Dagar Letter, Ex. A at 1.  At the same time, Amit takes responsibility for these thoughts and feelings: "I don't blame anyone for my situation, it's my actions which have led me here. . . . I know my actions have put me here and I understand only my actions going forward can redeem me."  *Id.* at 2.  Many of Amit's family members and friends have seen how he shows genuine remorse for his actions.  According to Shruthi, who knows him best, Amit "has a deep regret over his actions and [is] genuinely sorry for any harm he has caused. . . . I have seen him taking responsibility and he is now committed to living his rest of his life as a law-abiding citizen.  He is very focused on self-improvement."  S. Dagar Letter, Ex. B at 1-2.  Shruthi goes on: "Being his wife and spending most of the time around him I have seen that he understands the impact his action has made, and he has learnt from his mistakes and is committed to making amends and has a genuine desire to set things right."  *Id.* at 3.

Amit's friends have also seen this side of Amit.  One friend writes:

> I must also acknowledge Amit's profound remorse and regret for his actions that have led to the current investigation and criminal proceedings.  He has expressed genuine accountability for his mistakes and the pain they have caused, demonstrating a deep sense of remorse that he will carry with him for the rest of his life.

S. Kanagala Letter, Ex. C at 51; *see, e.g.*, A. Bansal Letter, Ex. C at 4 ("[Amit] acknowledges the gravity of the situation and is determined to learn from his mistakes.").  This has "been a period of profound reflection for Amit.  He is genuinely remorseful for his actions and fully understands the repercussions that his action has brought not only on him but most painfully, on his own

family." M. Dagar Letter, Ex. C at 28.  According to another friend, "over the past year and a

half, I have noticed that Amit has suffered from unbearable humiliation, pain, and regret over

what happened." S. Turang Letter, Ex. C at 49.  Another friend relates that:

> [Amit] has told me that he has difficulty sleeping at night, he hasn't been able to
> eat properly, and that his constant anxiety has affected his overall health.  Most
> significantly, he suffers a lot due the pain that the criminal proceeding is causing
> his wife, daughter and rest of the family and friends.  He has told me that the
> thoughts of him not being with his family causes him pain beyond description.

R. Desai Letter, Ex. C at 37.  "[T]here is not one day that goes by where Amit has not cried since

this all started and all he worries is about his family and especially M█.  All he thinks about

them and the bond that he shares with M█ is simply inseparable." S. Pall Letter, Ex. C at 41.

 Nevertheless, despite Amit's "inner turmoil, he remains steadfast for the sake of his loved

ones, particularly his young daughter and old mother." A. Turang Letter, Ex. C at 2.  As Amit's

sister-in-law puts it, "[a]midst his own trials and tribulations over the past year and a half, Amit's

unwavering commitment to his family remains resolute." S. Dagar Letter, Ex. C at 55.  "Even in

challenging times, [Amit] maintains his composure and hides his tears behind a smiling face for

the sake of his daughter, who finds joy and happiness in his presence." S. Turang Letter, Ex. C

at 49.

### III. The Offense Conduct

 The final PSR prepared by the United States Probation and Pretrial Service Office (the

"Probation Office") reflects the government's allegations about Amit's offense conduct based on

a "review of court-related documents and information provided by the Government." PSR ¶ 8.

However, the offense conduct set forth in the PSR does not accurately reflect the objective

evidence established at trial but largely recites the original Indictment.  We recognize that this

case was tried to verdict and that Amit was found guilty, but the general verdict is not an

endorsement of each allegation the government has made, or of each theory of the offense that the government presented at trial.

The Probation Office's recitation of the original Indictment in the PSR ignores evidence admitted at trial that demonstrates Amit was not engaged in a deliberate scheme to obtain and use Pfizer's material non-public information to place and profit from securities trading. Rather, Amit made a spur-of-the-moment decision to trade based on unsolicited information he received hours earlier. Amit does not fit the mold of a prototypical insider trader, which is what the Sentencing Guidelines (the "Guidelines") were designed to address.

A cascade of mistakes and errors led to Amit receiving the information the jury determined was material non-public information. The mistakes began with Kannan Natarajan accidentally emailing Mr. Oberoi, thinking Mr. Oberoi was a member of the unblinded team. Mr. Oberoi's only knowledge of the Paxlovid study results came from the email he received from Mr. Natarajan. *See* Tr. 285:21-22. Mr. Oberoi never forwarded the email to Amit or anyone else, *see* Tr. 322:7-10, and did not explicitly discuss the results with Amit, *see* Tr. 320:3-10. Before contacting Amit via Teams, Mr. Oberoi contacted his director supervisor to discuss the issue, and that supervisor expressly instructed Mr. Oberoi in writing: "Please do not reach out to anyone else to discuss until the results are made public." DX 509. Mr. Oberoi defied this directive when he messaged Amit on Teams.

Whatever information Amit learned from the November 4, 2021 Teams chat, he never sought it out. There was no scheme, plan, or any sort of premeditation. This was not a case where Amit solicited information about the results of the Paxlovid trial from Mr. Oberoi or anyone else. Amit did not go searching for the results in Pfizer's systems or elsewhere. He did not even try to extract more information about the results from Mr. Oberoi during their Teams

24

chat.  There was no pre-planning or other scheming on Amit's part.  He simply received the message from Mr. Oberoi and then decided to purchase Pfizer options shortly thereafter.  This was in keeping with his practice of placing bets on other companies' options before earnings announcements.

Amit also did not take steps that would have maximized his profits from the trades at issue, showing a lack of pre-planning or scheming.  He purchased three tranches of Pfizer options on November 4, 2021: 200 options with a strike price of $44 set to expire the next day on November 5 (for $1,894.27); 265 options with a strike price of $45.50 set to expire a week later on November 12 (for $3,344.66); and 200 options with a strike price of $46 set to expire two weeks later on November 19 (for $3,534.27).  GX 401.  Peter Melley, the government's expert from FINRA, testified that the 200 options with a strike price of $44 and expiration date of November 5 were the "cheaper" and "riskier" options, meaning Amit stood to make much more money on those than the other two tranches.  *See* Tr. 570:19-573:22.  Instead of putting all his money into the cheaper and riskier options, Amit spent more money to place his usual bet size on the more expensive and less potentially lucrative options.  *See* Tr. 560:13-16.  Melley testified that Amit would have received "substantially" more profit if he had taken the total $8,773.20 he

The evidence also shows a lack of intent by Amit to deceive anyone with his trading.  Amit made the Pfizer option trades in his own name.  He did not try to hide his trading by setting up an account that was not in his own name, or by having someone else place the bets for him, as is often the case with insider trading.  At the time Amit placed his trades, he was under no trading restriction from Pfizer, *see* Tr. 146:14-19, and did not consider whether his trading activity that day was restricted.  His decision to trade was made impulsively.

spent on the options and put all of that towards the cheapest and riskiest options.  Tr. 570:19-573:22.

　　　This offense was propelled by Amit's ████████ to the thrill and risk of gambling on stock options.  Having lost hundreds of thousands of dollars, his career, and, potentially, his ability to live the life he built in the United States with his family, he now recognizes that his behavior was harmful and impulsive.  Amit's trades on November 4, 2021 were a symptom of ██████████ ████████, for which he intends to seek counseling.  Amit began gambling on stock options in approximately 2018 or 2019.  PSR ¶ 69.  "[H]e did not research before buying certain stock options and ended up in a 'hole.'  In an attempt to recover his losses, [Amit] continued to purchase stock options and continued to lose more money.  [Amit] related that he was trading daily using money from his savings account and retirement account. He eventually depleted both accounts and lost upwards of $300,000."  *Id.*

　　　It is clear that Amit had a ██████████████████ when it came to options trading.  "It was normal for [Amit] to trade several times in a day."  A. Dagar Letter, Ex. A at 2.  He often traded before earnings calls and made bets that the news on the calls would be positive or negative.  "Without realizing it," he writes, "I had become a ████████████."  *Id.*  This is borne out by Amit's trading records, which show that he made thousands of options bets between 2018 and 2023.  *See* GX 102; GX 107.  "When I reflect on my actions," he adds, "I realize I was ████████████████████."  A. Dagar Letter, Ex. A at 2.

　　　As a result of his ██████████████, Amit "did not consider the implications of his conduct."  PSR ¶ 69.  Amit "has reflected on the harm that his gambling problem has caused to his wife and daughter, as well as the impact that the use of funds will have on their well-being

and future. . . . [Amit] has ceased trading in the stock market and ██████████

████████████████.ˮ *Id.*

## IV.    **The Probation Office's Guidelines Calculation Overstates Gain**

The Probation Office issued the final PSR on April 29, 2024.  The PSR calculates a Total

Offense Level of 18 with a Base Offense Level 8, an upward adjustment of +12 for a gain

amount of $272,861.99 (between $250,000 and $500,000), and a downward Chapter Four

Adjustment of –2 because Amit is a zero-point offender meeting the criteria specified in

U.S.S.G. § 4C1.1(a)(1)-(10).  PSR ¶¶ 35-43.

| | |
|---|---|
| Base Level Offense (U.S.S.G. § 2B1.4(a)) | 8 |
| Gain Amount (U.S.S.G §§ 2B1.4(b)(1), 2B1.1(b)(1)(G)) | +12 |
| Chapter Four Adjustment (U.S.S.G. § 4C1.1(a)) | –2 |
| | |
| Total Offense Level | 18 |

The Probation Office concluded that, "[b]ased upon a total offense level of 18 and a

criminal history category of I, the guideline imprisonment range is 27 months to 33 months." *Id.*

¶ 91.

Notwithstanding this calculation, the Probation Office recommends that the Court apply a

significant downward variance and "impose a sentence of 15 months' imprisonment on each

count, to be served concurrently, to be followed by three years' supervised release on each count,

to be served concurrently." *Id.* at 30.  That recommendation is half of the Guidelines calculation.

The Probation Office explained that a variance from the Guidelines range of 27 to 33

months' imprisonment to 15 months' imprisonment was warranted in light of various factors

including that Amit is a first-time offender, the charges of which he was convicted were non-

violent, he has remained in compliance with his conditions of release, his risk of recidivism is

low, he is the primary caregiver of his four-year-old daughter, he was a contributing member of

27

society prior to the instant offense, he has a strong support network, and he has a ███████████

████████████████████████. *Id.* at 29.

The Probation Office also recommends that Amit forfeit the purported gain amount of $272,861.99 and pay a fine of $10,000 and a special assessment of $200. *Id.* at 28.

## A. The Gain Amount Is Inflated

The Probation Office adopted the government's position that the gain amount is $272,861.99. *Id.* ¶ 36. In the government's view, this represents "the increase in the price of the options from when the defendant purchased the options to when he sold them." *Id.* at 25-26. The government points to evidence that Amit purchased 665 options for $8,773.20 on November 4, 2021 and subsequently sold those 665 options on four different days over the following month (November 5, 12, 17, and 19) for a total of $281,635.19. *See* GX 401 at 3. Based on the government's theory, Amit gained $272,861.99 (i.e., $281,635.19 – $8,773.20).

This calculation overstates the gain amount. Section 2B1.4(b)(1) of the Guidelines directs that the base offense level be increased by the number of levels in Section 2B.1.1 based on "the gain *resulting from the offense*" rather than the total gain from trading activity. U.S.S.G. § 2B1.4(b)(1) (emphasis added). Here, as explained below, the gain resulting from the offense is the gain that Amit would have received if he had sold all of the 665 options he had purchased on November 4, 2021 on November 5, 2021 when the material non-public information the jury concluded he possessed was released to the public (and thus no longer material non-public information) and baked into Pfizer's stock price. In this case, that is $155,654.99.

The "gain resulting from the offense" "must be limited to the gain resulting from the deception of trading with insider knowledge," and "[t]he gain resulting from the deception stops when the deception stops." *United States v. Jing Wang*, 2015 WL 1955045, at *6, *8 (S.D. Cal.

28

Apr. 29, 2015) (quoting *United States v. Mooney*, 425 F.3d 1093, 1106 (8th Cir. 2005) (Bright, J., dissenting)).  In the context of insider trading, the deception is stopped when the inside information upon which a defendant traded is made public and the market and relevant stock price adjust to the information.  *Mooney*, 425 F.3d at 1106 (Bright, J., dissenting).  As Judge Myron Bright of the Eighth Circuit explained in his dissent in *United States v. Mooney*:

> If someone buys stock illegally on the basis of insider knowledge, there may be an increase in the stock's value when the insider knowledge is made public.  That increase is illicit, resulting from a kind of deception to the other buyers and sellers of the stock.  After the market adjusts to this information and the deception is ended, the value of the stock will, of course, continue to fluctuate according to the ordinary, legitimate vagaries of the market—with no deception—and thus, no offense under 15 U.S.C. § 78j—involved.  Thus, if the person holds the stock for another five years after the insider knowledge has been made public, the value of the stock will continue to rise or fall regardless of the prior deception.

*Id.*

At least one court in this District has agreed with Judge Bright.  In *United States v. Rajaratnam*, the Court—in the section of the decision titled "The Court's Gain Calculation For the Period Between the Public Announcement and a Later Sale"—wrote that "Judge Bright's reasoning is persuasive" and further explained that, once the inside information is made public, any gain from a later sale based on the defendant's decision to hold the stock "would hardly be the result of any offense."  2012 WL 362031, at *10 (S.D.N.Y. Jan. 31, 2012) ("When inside information has been announced, a defendant who has earned profits from trading on it has a choice: should he cash out his profits if the thinks that the stock will fall or should he hold on to his stock if he thinks that the price will rise?  Assuming that the defendant has no other inside information, he faces the same choice as any other investor.  Thus the defendant's decision to hold the stock is no less 'lawful trading' than any other investor's decision to purchase it.").

Based upon this reasoning, Amit's "gain resulting from the offense" should be calculated by assessing the gains he would have made if he sold all of the 665 Pfizer option contracts on November 5, 2021 at $47.65—the price at which he sold 200 of the total 665 option contracts on November 5, 2021.  While a jury found that Amit possessed material non-public information on November 4, 2021 when he purchased the 665 Pfizer option contracts, he was cleansed of that material non-public information once it was released to the market on November 5, 2021.  At that time, any price increase from the release of the positive material non-public information had been absorbed into the market and Pfizer's stock price.  Any subsequent movements in the stock price in the following weeks were unrelated to the material non-public information.  Based on the calculations below, if Amit had sold all 665 Pfizer option contracts on November 5, 2021 at the price of $47.65, he would have generated gains of approximately $155,654.99.

As reflected in Amit's trading records, on November 5, 2021, he sold 200 option contracts with a strike price of $44 for a total of $3.65 per option, meaning Pfizer's stock price at the time was $47.65 (i.e., $44 + $3.65).  Selling 200 option contracts, or 20,000 total options, at $3.65 per option resulted in a gross sale amount of $73,000.  Amit's trading records show that the options themselves cost $1,894.27 to purchase, while the transaction fee for this sale was $167.60.  This means his net profit from the sale was $70,938.13 (i.e., $73,000 – $1,894.27 – $167.60).  *See* GX 102 at 968.

Applying this analysis to the 265 option contracts with a strike price of $45.50, if Amit had sold such options when Pfizer's stock price was $47.65 on November 5, 2021, he would have sold each option for a gain of $2.15 per option (i.e., $47.65 – $45.50).  Selling 265 option contracts, or 26,500 total options, at $2.15 per option would have resulted in a gross sale amount of $56,975.  Amit's trading records show that he purchased these 265 option contracts at a cost

of $3,344.66, and that the transaction fee when he actually sold them was $211.47. *See id.* at 967-69. This means Amit's net profit for a hypothetical sale of these options on November 5, 2021 would have been $53,418.87 (i.e., $56,975 – $3,344.66 – $211.47).

Applying the same analysis to the 200 option contracts with a strike price of $46, if Amit had sold such options when Pfizer's stock price was $47.65 on November 5, 2021, he would have sold each option for a gain of $1.65 per option (i.e., $47.65 – $46). Selling 200 option contracts, or 20,000 total options, at $1.65 per option would have resulted in a gross sale amount of $33,000. Amit's trading records show that he purchased these 200 option contracts at a cost of $3,534.27, *see id.* at 967, and that the transaction fee when he actually sold them was $167.74, *see id.* at 971-72. This means Amit's net profit for a hypothetical sale of these options on November 5, 2021 would have been $29,297.99 (i.e., $33,000 – $3,534.27 – $167.74).

Thus, if Amit had sold all 665 Pfizer option contracts at the same time on November 5, 2021, his total profit would have been $155,654.99 (i.e., $70,938.13 + $53,418.87 + $29,297.99). After the announcement of the Paxlovid study results on November 5, 2021 and the market's absorption of that alleged inside information, Pfizer's stock price continued to increase based upon the market's assessment of Pfizer with all material information available for consideration. Any further gains from the increase to Pfizer's stock price were not "resulting from the offense" and thus cannot properly be considered in Amit's gain amount under Section 2B1.4(b)(1).

In applying Section 2B1.1(b), the gain amount should result in an upward adjustment of no more than +10 for a gain of approximately $155,654.99 (between $150,000 and $250,000).

### B. Amit Is Eligible for a Downward Adjustment for Acceptance of Responsibility

Section 3.E1.1(a), which should be applied to Amit's Guidelines calculation, provides for a two-point reduction for a clearly demonstrated acceptance of responsibility. The fact that a

defendant has been convicted at trial "does not automatically preclude a defendant from consideration for such a reduction." Application Note 2, U.S.S.G. § 3E1.1. Where a defendant has been convicted at trial, the Court should consider the defendant's pre-trial statements and conduct. *Id.*

Amit demonstrated acceptance of responsibility for his actions in trading in Pfizer securities while he knew information regarding Pfizer that the general public did not know. Prior to trial, in February 2023, Amit "volunteered" to his supervisor, Mr. Oberoi, that he had traded in Pfizer, it was "spur of the moment," and he had "made a mistake." Tr. 348:25-349:2, 350:2-6, 674:20-675:9. Amit has not subsequently denied these statements.

Amit has also demonstrated acceptance of responsibility after trial. In his letter to the Probation Office in response to the initial PSR, Amit further demonstrated an acceptance of responsibility. He acknowledged that he traded in Pfizer securities after being exposed to information that was not generally available to the public and that had been designated by Pfizer as confidential. PSR at 24. Amit further acknowledged that he now recognizes that the information conveyed to him by his supervisor, Mr. Oberoi, on November 4, 2021 that there would be a "lot of work" coming up and that an outcome had been reached on the Paxlovid clinical trial, was material non-public information that the general public did not know. *Id.* at 24-25. Amit further acknowledged that he knew that a press release would be issued the next day and, consistent with his problematic ███████, was willing to wager that it would be a positive outcome. *Id.*

Most recently, Amit's letter to the Court submitted with this memorandum clearly demonstrates that he has taken responsibility for his actions and the resulting consequences:

> And I don't blame anyone for my situation, it's my actions which have led me here. . . . I am not trying to run from responsibility here . . . I regret those actions

every single moment.  But I know my actions have consequences and I must pay a
price for it. . . I know my actions have put me here and I understand only my
actions going forward can redeem me.

A. Dagar Letter, Ex. A at 1-3.  Based on these demonstrations of acceptance of responsibility,

Amit should receive a –2 downward adjustment to his Guidelines sentence.

### C.  Proposed Alternative Calculation

Based on the Guidelines arguments above, Amit respectfully submits that a proper

calculation under the Guidelines is as follows:

| | |
|---|---|
| Base Level Offense (U.S.S.G. § 2B1.4(a)) | 8 |
| Gain Amount (U.S.S.G §§ 2B1.4(b)(1), 2B1.1(b)(1)(F)) | 10 |
| Chapter Four Adjustment (U.S.S.G. § 4C1.1(a)) | –2 |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1) | –2 |
| | |
| Total Offense Level | 14 |

Based on a Total Offense Level of 14 with a Criminal History Category I, the sentence is in Zone

D with a recommended sentence range of 15 to 21 months' imprisonment.  And, as

acknowledged by the Probation Office, a significant downward variance is further warranted

from the Guidelines sentence in this case.

### V.    A Non-Custodial Sentence Complies with the Purposes of 18 U.S.C. § 3553(a)

### A.  Federal Sentencing Framework

The "overarching" command of Section 3553(a) instructs courts to "impose a sentence

sufficient, but not greater than necessary" to "accomplish the goals of sentencing."  *Kimbrough*

*v. United States*, 552 U.S. 85, 89, 101 (2007).  As this Court is aware, the U.S. Sentencing

Guidelines are advisory and are merely one factor to consider in determining an appropriate

sentence.  *Gall v. United States*, 552 U.S. 38, 45 (2007).  In fact, courts "may not presume that a

Guidelines sentence is reasonable" at all or that only "extraordinary circumstances . . . justify a

sentence outside the Guidelines range."  *United States v. Cavera*, 550 F.3d 180, 189-90, 199 (2d

Cir. 2008) (quoting *Gall*, 552 U.S. at 47); *see Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." (emphasis in original)).

As the Second Circuit has explained, the Court "must form its own view of the 'nature and circumstances of the offense and the history and characteristics of the defendant.'" *Cavera*, 550 F.3d at 188-89. The sentencing judge is also directed to consider the factors set forth in 18 U.S.C. § 3553(a)(2), which include: (a) "the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense"; (b) "the need to afford adequate deterrence to criminal conduct"; (c) "the need to protect the public from further crimes by the defendant"; and (d) "the need for rehabilitation." *Id.* (citing 18 U.S.C. § 3553(a)). Additionally, district courts must take into account: the kinds of sentences available, 18 U.S.C. § 3553(a)(3), any pertinent Sentencing Commission policy statements, *id.* § 3553(a)(5), the need to avoid unwarranted sentence disparities among similarly situated defendants, *id.* § 3553(a)(6), and, where applicable, the needs to provide restitution to any victims of the offense, *id.* § 3553(a)(7).

In fashioning a just sentence, the Court must conduct its own "independent review of the sentencing factors, aided by the arguments of the prosecution and defense" and exercise discretion in fitting the sentence in this case to the defendant's individual circumstances, giving "consideration [to the Court's] own sense of what is a fair and just sentence under all the circumstances." *Cavera*, 550 F.3d at 189; *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006). It is not the amount by which a sentence deviates from the applicable Guidelines range that is the measure of how "reasonable" a sentence is. *United States v. Dorvee*, 616 F.3d 174,

184 (2d Cir. 2010) (citing *Gall*, 552 U.S. at 46-47). Rather, "[r]easonableness is determined instead by the district court's individualized application of the statutory sentencing factors." *Id.*

### B. A Downward Variance Is Warranted Under 18 U.S.C. § 3553(a)

Amit agrees with the Probation Office that a downward variance is warranted in this case based on the various factors described in the PSR. PSR ¶¶ 28-30. A more significant downward variance than recommended by the Probation Office is warranted based on the considerations relevant to the Section 3553(a) factors described below.

Based on these considerations and those articulated in the PSR, Amit respectfully requests that the Court impose a non-custodial sentence of probation or home confinement.

### 1. Amit's History and Characteristics Support a Non-Custodial Sentence

As stated by Judge Castel in *United States v. Adelson*:

[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

441 F. Supp. 506, 513-14 (S.D.N.Y. 2006).

Courts in this Circuit have granted a downward departure and imposed a non-custodial sentence on a fraud defendant with a Guidelines sentence of 41 to 51 months' imprisonment where the character and history of the defendant showed that he was an exemplary individual who gave back to those around him and had already experienced significant collateral consequences as a result of the conviction. Transcript of Sentencing Hearing at 37:4-38:24, *United States v. Schulman*, No. 16-cr-442 (E.D.N.Y. Sept. 26, 2017) (ECF No. 155) (describing letters of support showing that the defendant cared deeply about his family, friends, and

community, put family first, cultivated a loving family, supported the personal and professional lives of his work colleagues, went out of his way to help friends and his community, suffered tremendously reputationally and emotionally as a result of his conviction, and yet continued to make positive difference in the lives of those around him).  The Court should do the same here based on Amit's character and giving nature, the impact a custodial sentence will have on his family, friends, and community, and the disparate treatment that will result from a custodial sentence based on his status as a non-citizen.

### i.    Amit's Character and Giving Nature

As described above, *see supra* pp. 11-21, Amit has led an extraordinary life premised on helping anyone in need and with the goal of doing no harm to anyone.  He is a first-time offender who, prior to this case, was a law-abiding permanent green-card holder working hard to achieve a better life—not for himself—but for his family and friends.  *See United States v. Mullings*, 131 F. Supp. 3d 1, 4 (E.D.N.Y. 2015) (custodial sentence unnecessary where defendant's conduct "appeared to be an 'aberration' from his otherwise lawabiding life"); *United States v. DiAmbrosio*, 2008 WL 732031, at *3 (E.D. Pa. Mar. 13, 2008) (non-Guidelines, non-custodial sentence appropriate where fraudulent conduct was exception to an otherwise law-abiding life).

As one of Amit's friends described, Amit "epitomizes the saying 'a friend in need is a friend indeed.'"  A. Bhanose Letter, Ex. C at 5.  Shruthi puts it best:

> [Amit's] good heart, helping nature, care and concern for others, hardworking nature, selflessness, loyalty are some of the positive qualities what made me want to spend the rest of my life with him.  These last 18 years since I have met Amit, he proved himself to be a best friend and a wonderful husband to me and a loving father to our 4-year-old daughter M██.  He is a kindhearted person who consistently goes out of his way to help others.  He is someone who sees good in everyone.

S. Dagar Letter, Ex. B at 1; *see supra* pp. 15-21 (citing letters in support of Amit regarding Amit's character). And the 43 letters of support from Amit's family, friends, and former colleagues accompanying this memorandum show this side of Amit. Each letter provides only a glimpse into the ways that Amit has changed all of their lives for the better and continuously volunteered himself to help, provide support to, and encourage them—never asking or expecting anything in return. We respectfully urge the Court to read these letters closely as they are an accurate portrayal of the person that Amit truly is and the good that he creates in his community and for anyone who is lucky enough to know him.

Even during this case and trial in January of this year, Amit did not lose this essence of his character. His friends describe his ongoing generosity despite dealing with his own difficulties:

> When I lost my job during Covid and had to vacate my apartment, he welcomed me into his home, where I lived for eight months. He didn't expect anything in return for it, not a single dollar, even though I quickly found a new job and was in no financial distress. Even last year, despite the hard times he's been going through, he offered to house my family if they were to come visit me in the US as I live in a one-bedroom apartment. Even during hard times, his generosity doesn't take a back step.

N. Vaddepalli Letter, Ex. C at 29.

> Recently, when Amit's trial was ongoing, ███████████████████████. I ██████████████. Even though, Amit himself was going through such a stressful situation, he did everything he could to comfort me. I was ███████████████ but Amit ensured I had everything necessary in my room, constantly said positive and humorous things to lighten up the tense environment, and checked up on me from time to time. This might seem like a small gesture but it meant the world to me and my parents. My mom and dad were at ease knowing that I was at Amit's place. Here, I want to stress on the fact that, he did all this and more, whilst going through the most stressful time of his life. He was the first person I could think of ██████████ and I stayed at Amit's place until I was completely recovered."

A. Vaddepalli Letter, Ex. C at 7.

Amit is an extraordinary example of a kind and hardworking individual, doting and responsible father, devoted and supportive husband, and reliable and cheery friend. Amit is humbled by the support he has received from his family, friends, and community and by the way that each of them has attested to his good moral character and generous and giving nature. *See United States v. Butler*, 2011 WL 4073672, at *4 (E.D.N.Y. Sept. 13, 2011), *aff'd*, 501 F. App'x 8 (2d Cir. 2012) (imposing non-Guidelines sentence "in large part because defendant was 'supported by a large community of family and friends, and a wife and child, who have attested to his good character in written submissions to the court'").

### ii.    The impact on Amit's family, friends, and community

Any sentence of imprisonment will create severe hardship for Amit's wife and daughter, extended family, friends, and broader community. *See United States v. DiMattina*, 885 F. Supp. 2d 572, 582 (E.D.N.Y. 2012) (justifying variance from Guidelines range and imposing a sentence of a year and a day based, in part, on the fact that the defendant's "family will suffer emotionally and financially from his absence during his long incarceration").

Amit's daughter, M█, is the center of his life. *See* A. Dagar Letter, Ex. A at 3; *see supra* pp. 11-15. One of Amit's close friends for the past seven years describes their relationship and the importance of their bond:

> The important thing that I [would] like to highlight to you about Amit is how he always has been a great husband and a provider to his wife and to an adorable 4-year-old baby girl named M█. M█ is simply Amit's world and equally she is a daddy's girl who shares a very special and irreplaceable connection that shapes M█'s life in profound ways. From waking her up, to feeding her, dropping her to school, silly day to day endless conversations, playing with her, picking her from school, combing her hair, going out to playgrounds, backyard play, putting her to bed daily, giving her baths and putting up with her countless tantrums are just few day-to-day that connects both together.
>
> M█ looks forward to Amit coming home when he is not around and no matter how much fun she has with her mother or others around her. Amit is her role

model, and she is so emotionally dependent on Amit that her day starts and ends
with Amit.  Amit, Shruti and M█ is all they have that makes up their little world
in US.

[H]onestly speaking there is not one day that goes by where Amit has not cried
since this all started and all he worries is about his family and especially M█.
All he thinks about them and the bond that he shares with M█ is simply
inseparable.

S. Pall Letter, Ex. C at 41.  Amit's friends and family describe that Amit "has always prioritized

his family's well-being and has been a pillar of strength for them" and that he "approaches

fatherhood with a sense of responsibility and devotion that is truly admirable. . . . [H]e

consistently strives to provide a nurturing and supportive environment for his child, ensuring that

[she] grow[s] up surrounded by love and stability."  A. Bansal Letter, Ex. C at 3.  In doing so,

Amit has been "actively and immensely involved in bringing up his daughter from the day she

was born" and the "love and affection they have for one another is palpable."  A. Bhanose Letter,

Ex. C at 5.  "Unquestionably, his wife and family are the most important things in his life."  K.

Burle Letter, Ex. C at 22.

Amit is the primary caretaker for M█ as Shruthi works long days to financially support

the family.  *See* A. Dagar Letter, Ex. A at 3; S. Dagar Letter, Ex. B at 3.  If Amit is sentenced to

a term of imprisonment, Shruthi will be required to support all three of them in all aspects—

financially, physically, and emotionally.  This result would cause severe stress and potentially

█████████████████ as Shruthi is ███████████████████████████████████

since Amit's arrest.  *See* A. Dagar Letter, Ex. A at 3.  Amit writes: "I am scared that if I am not

around then it will also affect ████████. I can't even imagine if something happens to Shruthi

then how I can live with myself."  *Id.*  Most of Amit and Shruthi's family members still reside in

India and are unable to take care of M█, and paying for childcare right now is not possible with

their financial situation as a result of this case.  S. Dagar Letter, Ex. B at 2 ("We have been a one

income family for the last 18 months and I work hard to make sure I keep my job. . . . Most of

our family is in India and we don't have the choice of taking any help from any family members

to help me take care of our 4-year-old daughter M█. I have a full-time job which I need to keep

at any cost with our current financial situation and if Amit is not around for an extended period it

would make mine and our daughter's life very difficult. I have my own fears about who would

take care of my daughter if I am ill or something else goes wrong with me for a brief period in

Amit's absence.").  If Amit is sentenced to a term of imprisonment, both Shruthi and M█ will

suffer greatly as there will be no one to provide caretaking support for M█ while Shruthi

continues working full time as is needed for their family to stay afloat.  *See also* U.S.S.G.

§ 5H1.6 (Sentencing Commission policy statement for downward departure where Guidelines

sentence will cause loss of essential caretaking or financial support to the defendant's family).

Amit's friends and family genuinely worry about Shruthi and M█'s well-being if Amit

is sentenced to a period of imprisonment.  One close friend writes:

> Moreover, I wish to highlight the unintended consequences that a lengthy
> sentence could impose on particularly his 4-year-old daughter.  Having had the
> privilege of acquainting myself with his family, I am genuinely concerned about
> the potential disruption and emotional toll such a separation would exact upon
> them.  The absence resulting from his sentencing could create a significant
> emotional vacuum, especially impacting his young daughter, who is currently in a
> critical developmental phase.

U. Patel Letter, Ex. C at 59; *see, e.g.*, D. Mettu Letter, Ex. C at 13 ("We are all very concerned

about the impact this would have on [Amit's daughter] and do not know how to explain any

painful outcome from the sentencing.  I am also concerned about the challenges my sister

[Shruthi] would be facing in raising her daughter in her husband's absence."); N. Pandya Letter,

Ex. C at 31 ("The thought of Amit having to face any time in prison and be separated from his

wife and little girl is too difficult for me to digest.  It pains me a great deal that his little daughter

will not have Amit around while she is growing up and she won't be able to share all those sweet moments with Amit that a daughter shares with his father otherwise."); Z. Patel Letter, Ex. C at 62 ("I respectfully urge you to consider alternatives to incarceration that would allow him to remain with his family.  Separating Amit from his loved ones through incarceration would not only impact him but also inflict immeasurable emotional hardship on his family.  I believe that with the right support and guidance, Amit can continue to contribute positively to society while remaining an integral part of his family's life."); P. Chhetri Letter, Ex. C at 33-34 ("He is Shruthi's life and breath and M██ looks upon him as her protector and security.  To even think that they may not have him around them for a period of time is heart wrenching.  [It is] [h]eart wrenching for us so [I] cannot begin to fathom how Shruthi feels.  That love that he has shown everyone else's children is going to be missed by his own daughter no matter how short a period if he is sent away.").

Amit's extended family, most of whom live in India, will also be impacted if Amit is given a custodial sentence.  Many of them have written letters in support of Amit which have been submitted with this memorandum.  *See* M. Dagar Letter, Ex. C at 27-28; D. Ambati Letter, Ex. C at 15; M. Rana Letter, Ex. C at 24-25; A. Rana Letter, Ex. C at 9-10; R. Dagar Letter, Ex. C at 38-39; Sanjeev Dagar Letter, Ex. C at 44; S. Katariya Letter, Ex. C at 45-46; Suman Dagar Letter, Ex. C at 55-56.  Amit calls his family in India every Saturday, *see* Sanjeev Dagar Letter, Ex. C at 44, supports them financially, *id.*, provides guidance and mentorship to younger family members, *see* R. Dagar Letter, Ex. C at 38-39, and monitors their health from afar, *id.*  If imprisoned, Amit will lose this connection to his family in India who rely on him.  In particular, Amit will be prevented from supporting his mother who lives in India and ██████████

███████    as well as his mother-in-law and father-in-law who also ████████████████████

███████████████████.  *See* PSR ¶¶ 52, 57.

Any term of imprisonment will also cause emotional, caretaking, and financial hardship for Amit's friends and community as they truly rely on him in their daily lives, as shown in the letters of support submitted with this memorandum.  As one friend summed up so well, Amit "go[es] lengths to help everyone he can, in every way he can. . . . He is a great husband, a devoted father and one of the most compassionate human beings."  A. Vaddepalli Letter, Ex. C at 8; *see supra* pp. 15-21 (citing examples of Amit helping his friends and community).  His life is defined by those attributes and the actions leading to this case were the biggest mistake of his entire life.  *See United States v. Howe*, 543 F.3d 128, 133 (3d Cir. 2008) (affirming non-Guidelines, non-custodial sentence of probation based in part on crime being an "isolated mistake").

### iii.    Amit's immigration status has unique impacts on his sentence

Amit is an Indian citizen who has lived in the United States for over 20 years as a permanent resident.  A. Dagar Letter, Ex. A at 2; S. Dagar Letter, Ex. B at 1.  As a non-citizen, Amit's immigration status creates at least three harrowing realities if he receives a sentence of imprisonment which will result in a more severe sentence than other similarly situated defendants.

First, if sentenced to a term of imprisonment, Amit will be ineligible to serve his time in a federal prison camp where any other similarly situated American defendant would be placed, resulting in disparate treatment and a more severe punishment solely based on his immigration status.  The Bureau of Prisons (BOP) maintains a policy that "[a] male or female inmate who is not a citizen of the United States . . . shall be housed in at least a Low security level institution."

BOP Program Statement 5100.08, Chapter 5, page 9. Although Amit has lived in the United States peacefully for over 20 years as a permanent resident and is a first-time, non-violent offender convicted of a financial crime, this policy precludes Amit from serving any portion of his sentence in a minimum-security camp where similarly situated defendants would typically be placed.

In light of the BOP's "ridiculous" policy,[2] a district court in the Northern District of Illinois recently sentenced a defendant in *United States v. Agarwal* to time served and 3 years in community confinement (i.e., a BOP half-way house). *See* Judgment in a Criminal Case at 1, *United States v. Agarwal*, No. 19-cr-864 (N.D. Ill. July 1, 2024) (ECF No. 807). There, the defendant was an executive of a health technology start-up company convicted of 15 fraud charges after trial for her role in a scheme that targeted the company's clients, lenders, and investors and caused losses of more than $500 million for which the government had requested 10 years' imprisonment and the Court had sentenced a co-defendant the day before to 7.5 years' imprisonment. *Id.*; Government's Position Paper on Sentencing Factors and Objection to the Presentence Report Regarding Defendant Agarwal at 2, *United States v. Agarwal*, No. 19-cr-864 (N.D. Ill. June 14, 2024) (ECF No. 751).

In sentencing the defendant, the court received affidavits from BOP experts and former BOP personnel provided by the defendant which described the practical differences in the treatment between inmates housed at minimum-security and low-security facilities including that, if housed in a low-security facility, the defendant would face:

---

[2] Lauraann Wood, *Judge Blasts Prisons Bureau, Sends Exec to Halfway House*, Law 360 (June 27, 2024, 10:14 PM ET), https://www.law360.com/articles/1852226/judge-blasts-prisons-bureau-sends-exec-to-halfway-house (reporting on sentencing hearing in *United States v. Agarwal*).

> (1) increased risk of victimization by fellow inmates; (2) housing in a more restrictive setting including controlled movements, fences, concertina wire, and roving patrols; (3) mass body checks with strip searches; . . . (5) more restrictive visitation; and (6) overcrowding resulting in sleep disturbances and limited access to food and hygiene.

Defendant Agarwal's Sentencing Memorandum at 43, *United States v. Agarwal*, No. 19-cr-864 (N.D. Ill. June 14, 2024) (ECF No. 753) (citing Declaration of Joel A. Sickler in Support of Defendant Shradha Agarwal's Sentencing Memorandum ¶¶ 13, 19-20, *United States v. Agarwal*, No. 19-cr-864 (N.D. Ill. June 14, 2024) (ECF No. 753-17) (attached as Ex. D) (40 year prison advocate and consultant); Declaration of Janet Perdue ¶¶ 16-18, *United States v. Agarwal*, No. 19-cr-864 (N.D. Ill. June 14, 2024) (ECF No. 753-18) (attached as Ex. E) (prison consultant and former BOP employee for 34 years)).

Judge McMahon of this District has similarly recognized the disparate impact of this BOP policy on non-citizens. In *United States v. Black*, the defendant was charged and convicted at trial of conspiracy to commit wire fraud and bank fraud and substantive wire fraud for his involvement in the LIBOR manipulation scheme. *See* Superseding Indictment, *United States v. Black*, No. 16-cr-370 (S.D.N.Y. Aug. 18, 2016) (ECF No. 22); Judgment in a Criminal Case, *United States v. Black*, No. 16-cr-370 (S.D.N.Y. Nov. 13, 2019) (ECF No. 456-1) (conviction reversed on appeal for entry of judgment of acquittal, *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022) (reversal unrelated to sentencing)). In sentencing the defendant, Judge McMahon calculated a Guidelines sentence of 57 to 71 months' imprisonment. *See* Transcript of Sentencing Hearing at 56:4-15, *United States v. Black*, No. 16-cr-370 (S.D.N.Y. Oct. 24, 2019) (ECF No. 451) (attached as Ex. F). However, Judge McMahon also considered the impact of BOP's policy for non-citizens and explained:

> If I could sentence Mr. Black to a term of incarceration—a brief term of incarceration—knowing that he would go to a facility appropriate to his criminal

conduct, I would do it.  But I know that I can't.  I know that simply because he is a noncitizen—and I use that term advisedly.  He is not an illegal alien.  But because he is a non-citizen, he will not be eligible to serve his sentence in the same way that any American citizen who stood convicted of this crime would serve.  And that's not right.

*Id.* at 56:4-15, 91:4-12.  Based on this reasoned rationale, Judge McMahon imposed a non-custodial sentence of term of time served with 9 months' home confinement and 3 years of supervision.  *Id.* at 95:6-9.

Amit is also a non-citizen who has lived in the United States for over 20 years.  He has worked hard and does all he can to provide for his family, friends, and community.  If Amit is sentenced to any term of imprisonment, he will be required by BOP to serve that sentence in, at best, a low-security facility which will threaten his physical and emotional well-being even more than he already suffered.  The Court should take this unwarranted additional punishment on Amit into consideration under Section 3553(a)[3] and sentence him to probation or home confinement in order to avoid imposing a sentence that is greater than necessary and which will result in a more severe sentence on Amit than a similarly situated defendant.  *See also United States v. Bakeas*, 987 F. Supp. 44, 49 (D. Mass. 1997) (granting downward departure because "[p]rison camp and a medium security prison are as different in kind as are home detention and community confinement, and they have as great an impact on whether [the defendant's] sentence is 'greater than necessary.'  It would be inconsistent for the guidelines to instruct me to consider the latter difference and forbid me to consider the former.")

---

[3] This additional punishment of a harsher prison placement is relevant to the "history and characteristics of the defendant," U.S.S.G. § 3553(a)(1), the need to "provide just punishment for the offense," *id.* § 3553(a)(2)(A), "to afford adequate deterrence," *id.* § 3553(a)(2)(B), to provide "correctional treatment in the most effective manner," *id.* § 3553(a)(2)(D), "the kinds of sentences available," *id.* § 3553(a)(3), "to avoid unwarranted sentence disparities," *id.* § 3553(a)(6), and to the overall consideration that courts impose a sentence "sufficient, but not greater than necessary," *id.* § 3553(a).

Second, Amit's status as a non-citizen means that, after Amit serves any term of imprisonment, U.S. Immigration and Customs Enforcement (ICE) will lodge a detainer and place Amit in immigration detention pending deportation proceedings. *See* 8 U.S.C. § 1182(a)(2) (requiring post-sentence immigration detention for any non-citizen convicted of fraud upon release from BOP custody). In 2021—the most recent year for which statistics are publicly available—the average length of stay in an ICE detention center for a convicted noncitizen was 73.3 days (approximately 2.5 months). *See* Dep't Homeland Sec., U.S. Immigration & Customs Enf., Strategic Context (Fiscal Year 2023) at ICE-3 (attached as Ex. G). This period of detention will serve as an extension to any term of imprisonment imposed on Amit. *See United States v. Rodriguez*, 2022 WL 158685, at *5 (S.D.N.Y. Jan. 18, 2022) (Oetken, J.) (referring to the defendant's deportation as a "form of punishment itself" and noting that the defendant's time in an immigration detention center prior to deportation "will also add time to his term of incarceration" (citing *United States v. Chin Chong*, 2014 WL 4773978, at *6 (E.D.N.Y. Sept. 24, 2014)). To make matters more punitive, conditions at ICE detention facilities are notoriously poor.[4] The fact that any term of imprisonment would be extended by detention of uncertain duration in a sub-standard ICE detention facility further supports that a non-custodial sentence is appropriate in this case.

---

[4] *See* Brianne Hansen, *Living Conditions in U.S. Immigration Detention Center*, Ballard Brief (Spring 2019), https://ballardbrief.byu.edu/issue-briefs/living-conditions-in-us-immigration-detention-centers#:~:text=Conditions%20include%20inadequate%20health%20care,economic%20costs%20for%20the%20family; Tom Dreisbach, *Government's Own Experts Found 'Barbaric' and 'Negligent' Conditions in ICE Detention*, NPR (Aug. 16, 2023), https://www.npr.org/2023/08/16/1190767610/ice-detention-immigration-government-inspectors-barbaric-negligent-conditions; *Beyond Repair: ICE's Abusive Detention Inspection and Oversight System*, Nat'l Immigrant Justice Ctr. (Nov. 2023), https://immigrantjustice.org/sites/default/files/content-type/research-item/documents/2023-11/NIJC-Policy-brief_ICE-detention-inspections_November2023.pdf.

Third, a sentence of imprisonment—especially over one year—will be a strong negative factor in the outcome of Amit's deportation proceedings.  *See* 8 U.S.C. § 1227(a)(2) ("any alien who . . . is convicted of a crime for which a sentence of one year or longer may be imposed, is deportable").  Deportation is an especially harsh punishment for Amit who has otherwise been a hardworking and charitable member of his community in the United States.  *See United States v. Thavaraja*, 740 F.3d 253, 262-63 (2d Cir. 2014) ("In determining what sentence is 'sufficient, but not greater than necessary,' to serve the needs of justice, a district court may take into account the uncertainties presented by the prospect of removal proceedings."); *Chin Chong*, 2014 WL 4773978, at *6 ("Deportation is experienced as, and popularly understood to be, a form of punishment.  The law does not contend otherwise.").

And, if deported, Amit may lose the ability to live with his family and provide them with the opportunities they deserve.  Shurthi and M█ are both U.S. citizens.  S. Dagar Letter, Ex. B at 1.  If Amit is deported, their family will be forced to make the unimaginable decision between splitting up so that Shurthi and M█ can continue living in the United States with all of the opportunities it affords, or moving to India together, foregoing the opportunities that Amit and Shurthi worked so hard to provide to M█, and beginning a completely new life.  *Id.* at 1.  Not only will Shruthi be required to carry the load of financially and physically supporting M█, but she may lose her husband's presence entirely.  Similarly, M█ stands to lose the physical presence of her father in her life forever.  Such a punishment is far too severe based on Amit's demonstrated character and the circumstances of the offense in this case.

## 2.  The Nature and Circumstances of the Offense Favor a Non-Custodial Sentence

Amit chose to exercise his constitutional right to a jury trial and to put the government to its proof and hear the evidence and witnesses against him.  While a jury found Amit guilty, as

argued above, *see supra* pp. 24-26, Amit's trading was a spur-of-the-moment decision driven by his ▮▮▮▮▮▮▮▮▮▮▮▮ following the unsolicited receipt of information from Mr. Oberoi. His conduct was not pre-planned in any way. This was truly a one-time lapse that readily falls under the Sentencing Commission's policy statement of "aberrant behavior." *See* U.S.S.G. § 5K2.20(a)-(b) (Sentencing Commission policy statement that a downward departure for aberrant behavior is appropriate where the defendant committed a single criminal occurrence without significant planning, which was of limited duration, and represents a marked deviation by the defendant from an otherwise law-abiding life).

### 3. Sentencing Objectives Under 18 U.S.C. § 3553(a)(2)

A non-custodial sentence satisfies the federal sentencing objectives, including the need for the sentence imposed (1) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," (2) "to afford adequate deterrence to criminal conduct," (3) "to protect the public from further crimes of the defendant," and (4) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

First, a non-custodial sentence such as home confinement or probation will serve as "just punishment," because, in this case, Amit has already experienced significant collateral consequences. *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."); *Chin Chong*, 2014 WL 4773978, at *6 ("In imposing 'just punishment' for a particular offense, a sentencing judge cannot ignore the additional penalties and hardships that will attach as a result of conviction.").

As Amit and his wife, Shruthi, describe in their letters to the Court, Amit has lost two jobs, his career in the field he worked so hard to succeed in, his reputation, and his personal feelings of self-respect and confidence.  A. Dagar Letter, Ex. A at 1-2; S. Dagar Letter, Ex. B at 3 ("He has lost a lot because of this incident his peace of mind, confidence, strength, multiple jobs, career, finances, respect and maybe even the chance to live in this country. With this incident our lives will never be the same.").  Amit describes that this experience has completely broken him as a person, and he has experienced thoughts of ending his own life.  A. Dagar Letter, Ex. A at 3-4.  The only thing that has kept him afloat is how much worse the situation could be for his wife and daughter without him.  *Id.*  Amit writes that, on the day of his arrest, "[i]t felt like everything around me had collapsed."  *Id.* at 2.  That pain and torment has continued for both Amit and his family, and he only wishes to live the rest of his life to be there for his wife and daughter and do everything in his power to make their day better.  *Id.* at 3.  Shruthi describes that: "Amit is not the same jovial person he was before this incident.  He has changed a lot and keeps to himself and doesn't enjoy doing anything that he used to in the past.  He doesn't like to meet our friends and family or go out in crowds; he has a fear of interacting with others and keeps himself isolated most of the time . . . ."  S. Dagar Letter, Ex. B at 3.

As discussed above, *see supra* pp. 42-48, Amit also stands to face further collateral consequences as a result of his immigration status including that, if imprisoned, he will be required to serve his sentence in a low-security facility (rather than a minimum-security camp where a similarly situated U.S. defendant would serve), his imprisonment will be extended during his removal proceedings while he is in ICE detention, and he is likely to be deported if imprisoned for a year or longer.  *See Thavaraja*, 740 F.3d at 262-63; *Chin Chong*, 2014 WL 4773978, at *7 (a court tasked with "imposing a sentence that 'provide[s] just punishment' is

obliged to consider whether the defendant is likely to face deportation"). Deportation will also have a devasting impact on his family, including his daughter's future education and opportunities. *See supra* p. 47.

Second, a sentence of probation or home confinement will afford adequate deterrence to similar criminal conduct. With respect to specific deterrence, courts have noted that it is "not required" where the defendant has led a "law abiding background," and it is therefore "unlikely that [the defendant] will engage in further criminal activity." *United States v. Faiella*, 2008 WL 4862455, at *2 (E.D.N.Y. Sept. 8, 2008). Specific deterrence is unnecessary in this case. As demonstrated in the PSR and letters of support accompanying this memorandum, Amit is a law-abiding individual and holds the U.S. legal system in high regard. *See* PSR at 29 ("the defendant's risk of recidivism is low"); M. Dagar Letter, Ex. C at 27 ("He as a person has always remained a law-abiding citizen and even in India if anyone used to violate the traffic rules he used to counsel that person. He always had a high regard for rules and regulations."); M. Rana Letter, Ex. C at 24 ("I remember having long discussions with him about few corrupt practices in India and how to correct the same and he would vehemently oppose any body supporting the wrong practices by quoting and appreciating the transparent, honest, just and fair system in US. Anytime he would see anyone jumping a traffic light in India he would feel bad but would proudly boast that the US system has got into his blood, and it has become a part of his life to follow the correct practices and abide by the law anytime anywhere."); *see also* A. Dagar Letter, Ex. A at 2. Amit has also expressed sincere remorse for his actions and a genuine desire to benefit others:

> I want to be a better husband, father and most importantly a better person and contribute to society. I need a second chance in life, to restart, work hard, help people around me and if I can make someone's life better, I would think it was all worth it.

A. Dagar Letter, Ex. A at 4; *see supra* pp. 22-23.

General deterrence will also be served by a non-custodial sentence of probation or home confinement in light of the collateral effects that Amit has already endured as a result of his action and the resulting prosecution and conviction.  *See supra* pp. 48-50; *see also United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994) (stating that the "[e]limination of the defendant's ability to engage in similar or related activities" and "the substantial loss of assets and income . . . constitute[] a source of both individual and general deterrence"); *Stewart*, 590 F.3d at 141 ("[T]he need for further deterrence … is lessened because the conviction itself 'already visits substantial punishment on the defendant.'").

Third, a custodial sentence is not necessary to "protect" the public from Amit, a first-time, non-violent offender.  To the contrary, a custodial sentence will be a significant detriment to the community, given all the ways in which Amit helps those around him.  PSR ¶ 29.  As demonstrated by the clear pain and regret that Amit has expressed, *see, e.g.*, A. Dagar Letter, Ex. A at 1, 4, there is simply no basis to believe that Amit would re-offend.  As the Sentencing Commission has recognized, there is considerable research showing that first-time offenders like Amit are far less likely to commit another crime than other defendants.[5]

Fourth, while Amit does not need educational or vocational training or medical care, he is open to and would welcome assistance in attending ████████████████████████ ████████.  A sentence of probation or home confinement with a special condition related to his

---

[5] *See* Tracey Kyckelhahn & Trishia Cooper, U.S. Sentencing Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* at 6-9 (Mar. 2017). https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf.

attendance (remote or in-person) at ███████████████████████████ , *see* PSR at 32, would help Amit receive correctional ████████ in the most effective manner.

### 4. The Need to Avoid Unwarranted Sentencing Disparities and Promote Consistency in Sentencing Merits a Downward Variance

Section 3553(a)(6) provides that "the court shall consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Here, the Court should consider the non-custodial sentences of defendants convicted of fraudulent schemes with more aggravating factors than applicable here and the non-custodial sentence of Amit's co-defendant, Mr. Bhiwapurkar.

### i. A non-custodial sentence is consistent with sentences imposed upon similarly situated defendants convicted of fraud at trial

Courts in the Second Circuit and elsewhere have sentenced defendants convicted of fraud (including insider trading) at trial to non-custodial sentences of time served and probation. For instance:

- In *United States v. Black*, No. 16-cr-370 (S.D.N.Y.) (McMahon, J.), the defendant was charged with one count of conspiracy to commit wire fraud and bank fraud and nine counts of wire fraud for his involvement in the LIBOR manipulation scheme to obtain money by making false and fraudulent USD LIBOR submissions to the British Banker's Association for inclusion in the calculation of USD LIBOR. Superseding Indictment ¶ 26 (Aug. 18, 2016) (ECF No. 22). The defendant exercised his right to a jury trial and was **found guilty of the conspiracy count and one wire fraud count**. Judgment in a Criminal Case at 1 (Nov. 13, 2019) (ECF No. 456-1). The government sought a Guidelines calculation of 108 to 135 months' imprisonment. United States' Sentencing Memorandum Regarding Defendant Gavin Black at 1 (Oct. 10, 2019) (ECF No. 445). The Court calculated a Guidelines sentence of 57 to 71 months' imprisonment, in part based on a finding of $2.6 million in intended loss. Transcript of Sentencing Hearing at 56:4-15 (Oct. 24, 2019) (ECF No. 451) (attached as Ex. F). Judge McMahon, nonetheless, **sentenced the defendant to a term of time served with nine months' home confinement and three years of supervision**. *Id.* at 95:6-9. In imposing this non-custodial sentence, Judge McMahon closely considered the impact of BOP's policy prohibiting non-citizen defendants from being housed in a minimum-security facility where any other similarly situated defendant would be housed. To avoid this impropriety, despite the seriousness of the offense, Judge McMahon imposed a non-custodial sentence.

- In *United States v. Schulman*, No. 16-cr-442 (E.D.N.Y.) (Azrack, J.), the defendant was charged with insider trading.  Indictment (ECF No. 1).  The defendant, a lawyer who obtained material non-public information about a pending merger involving his firm's client, provided the information to his financial advisor who then purchased shares in one of the companies subject to the pending merger in the defendant's account, his own account, and other clients' accounts over a period of two days.  Government Letter at 2-4 (Sept. 18, 2017) (ECF No. 145).  The defendant was **convicted at trial of one count of conspiracy to commit securities fraud and one count of securities fraud**.  Judgment in a Criminal Case at 1 (Oct. 4, 2017) (ECF No. 153).  The government calculated a Guidelines range of 51 to 64 months' imprisonment and requested a sentence within that range.  Government Letter at 2-4 (Sept. 18, 2017) (ECF No. 145).  The Court calculated a Guidelines range of 41 to 51 months' imprisonment, however, **sentenced the defendant to a non-custodial sentence of 3 years' probation with 2,000 hours of community service**.  Judgment in a Criminal Case at 2, 4 (Oct. 4, 2017) (ECF No. 153); Transcript of Sentencing Hearing at 26:14-24 (Sept. 26, 2017) (ECF No. 155).  In imposing this non-custodial sentence, Judge Azrack explained that a downward departure was warranted pursuant to U.S.S.G. § 5K2.20 for aberrant behavior as well as based on the moving letters in support of the defendant.  Transcript of Sentencing Hearing at 23:18-24, 37:4-38:24 (Sept. 26, 2017) (ECF No. 155).

- In *United States v. Agarwal*, No. 19-cr-864 (N.D. Ill.) (Durkin, J.), the defendant—an executive of a health technology start-up company—was **convicted of five counts of mail fraud, two counts of bank fraud, and eight counts of wire fraud after trial** for her role in a scheme that targeted the company's clients, lenders, and investors that caused losses of more than $500 million.  Judgment in a Criminal Case at 1 (July 1, 2024) (ECF No. 807); Government Position Paper on Sentencing Factors and Objection to the Presentence Report Regarding Defendant Agarwal at 2 (June 14, 2024) (ECF No. 751).  The government sought a sentence of 10 years' imprisonment.  *Id.*  The Court, however, only **sentenced the defendant to time served with three years' community confinement in a halfway house**.  Judgment in a Criminal Case at 3-6 (July 1, 2024) (ECF No. 807).

- In *United States v. Amouzou*, No. 12-cr-571 (S.D.N.Y.) (Pauley, J.), the defendant was **charged with two counts of wire fraud and one count of conspiracy to commit wire fraud** for using his professional position at Columbia University to falsely claim to victims that he would obtain them work visas for a fee before collecting the fee and stopping communication with the victims.  Government Letter at 2-3 (Aug. 14, 2015) (ECF No. 92).  The defendant exercised his right to a jury trial and was **convicted on all counts**.  The Probation Office calculated a Guidelines range of 8 to 14 months' imprisonment and recommended a sentence of a year and a day imprisonment.  *Id.* at 1.  The government sought the Guidelines sentence.  *Id.* at 3.  However, Judge Pauley **sentenced the defendant to a non-custodial sentence of time served with 6 months' home confinement, and 36 months' supervised release**.  Transcript of Sentencing Hearing at 35:18-23 (Aug. 21, 2015) (ECF No. 96).  In imposing this non-custodial sentence, Judge Pauley referenced the hard work the defendant had done to get an education in Togo and move to the United States, that the defendant had otherwise led a "law-abiding life" in realization of the "American dream," and the defendant's family

53

who cared very deeply for him and expressed great concern as their fate was tied to the defendant's fate. *Id.* at 33:22-34:11.

- In *United States v. Defilippo*, No. 17-cr-585 (S.D.N.Y.) (Pauley, J.), the defendant was **charged with one count of conspiracy to commit wire fraud, one count of wire fraud, and one count of making false statements to the government**. Superseding Indictment (Jan. 25, 2018) (ECF No. 26). The conspiracy and wire fraud counts were based on allegations that the defendant, an Amtrak police officer, schemed with two other employees to defraud their employer, the Amtrak Police Department, by misrepresenting the nature of their work in order to obtain a higher pay rate and back pay under collective bargaining agreements. Defendant's Motion for Acquittal at 2 (Apr. 10, 2018) (ECF No. 75.) The defendant exercised his right to a jury trial and was **convicted on all counts**. The Probation Office calculated a Guidelines sentence of 8 to 14 months' imprisonment and recommended 8 months' imprisonment. Government Letter at 1 (July 18, 2018) (ECF No. 81). The government sought a sentence of 12 to 18 months' imprisonment. *Id.* at 2. However, Judge Pauley **sentenced the defendant to a non-custodial sentence of 2 years' probation, including 3 months of home confinement**. Transcript of Sentencing Hearing at 26:8-10 (Aug. 21, 2018) (ECF No. 91). In imposing this non-custodial sentence, Judge Pauley referenced that, although the defendant's conduct was a breach of the public trust, dishonest, and done with the purpose of obtaining benefits he was not entitled to, he was fired from his job and would never work in that profession again, he had uncertain prospects for employment, he lost the home he owned with his partially-disabled wife, he previously had an unblemished record and a difficult work schedule, and the investigation into defendant had started as a personnel issue. *Id.* at 21:20-25:9.

In these cases, the sentencing court recognized the harm that the case had on the defendant's ability to be a contributing member of society, the loss of the defendant's job and subsequent attempts to rebuild and support his family, the law-abiding lifestyle the defendant had previously lived, the hardworking and determined nature of the defendant, the impact of the prosecution, conviction, and a potential custodial sentence on the fate of the defendant's immediate family and the defendant's ability to support them.

In particular, at the sentencing hearing for the defendant in *United States v. Schulman*, in imposing a non-custodial sentence, Judge Azrack described the defendant based on the letters that had been submitted in support of him. This description could equally describe Amit based on the letters that have been submitted in support of him: a dedicated family man, a community

supporter, a reliable and encourage colleague and mentor, and a man who has already suffered

reputationally and emotionally.  Judge Azrak explained:

> But I am truly moved by the flood of letters submitted in support of the defendant. Those letters paint *a picture of a man who cares deeply about his family, his friends, his community, and his ideals*.  The letters describe *a man who puts his family first, and who goes out of his way to take care of his children, his grandchildren, his siblings, and his parents*.  Indeed, the defendant devotes a substantial portion of his time to caring for his elderly parents and his disabled sister, enabling them to continue to live full lives.  *The defendant has clearly built and cultivated a loving family, and his actions have already had a tremendous impact on all of them.*
>
> The letters I received also depict a lawyer who is beloved by those who work for him.  The letters consistently describe *the defendant as more concerned with the personal and professional well-being of his colleagues than with his own gain or advancement*.  The defendant appears to have gone well out of his way to act as a mentor and a friend to a number of young lawyers, often with no direct personal benefit.
>
> These letters also show *a man willing to go out of his way to help friends, acquaintances, colleagues, and members of his community*.  The defendant appears to have prioritized moral integrity and professionalism over raw financial gain throughout his life and career.  There is no indication that the defendant had ever betrayed the trust of his clients before.  That is why, as I said earlier, I believe that the defendant's conduct here is truly aberrant.
>
> And, finally, the letters show *a man who has already suffered tremendously, both in terms of his professional reputation and his emotional well-being*.  Despite that, I find it reassuring that the defendant has found positive ways to fill his time and give back to his community since his conviction.  And I commend him for being proactive in that regard.  In short, these letters that I've received paint a picture of a kind, caring, compassionate man, who has made and continues to make a positive difference in the lives of those around him.

Transcript of Sentencing Hearing at 37:4-38:24, *United States v. Schulman*, No. 16-cr-442

(E.D.N.Y. Sept. 26, 2017) (ECF No. 155) (emphases added) (sentencing the defendant convicted

at trial of insider trading and conspiracy to commit insider trading to 3 years' probation with

2,000 hours of community service despite Guidelines calculation of 41 to 51 months'

imprisonment).

In sentencing Amit, we respectfully request that the Court consider these same factors for Amit and impose a non-custodial sentence of probation or home confinement.

### ii.    The Court should consider the co-defendant's probationary sentence

The Court should consider the sentence of Mr. Bhiwapurkar, Amit's co-defendant, when applying the Section 3553(a) factors.  *See United States v. Ford*, 320 F. App'x 50, 52 (2d Cir. 2009) ("Section 3553(a) does not require, but permits district courts to consider sentencing disparity among co-defendants." (internal citations omitted)).  Here, Mr. Bhiwapurkar plead guilty to one count of securities fraud.  Transcript of Bhiwapurkar Plea Hearing at 6:17-7:8 (Oct. 19, 2023) (ECF No. 41).  This Court calculated a Guidelines range of 6 to 12 months' imprisonment but nonetheless sentenced him to 3 years' probation with 100 hours of community service, the forfeiture of $60,300 presenting proceeds traceable to the commission of the said offense, and a $100 special assessment.  Judgment in a Criminal Case (Bhiwapurkar) at 3-5 (Apr. 15, 2024) (ECF No. 116).

During the sentencing of Mr. Bhiwapurkar, the government and defense counsel distinguished Mr. Bhiwapurkar's conduct from that of Amit in three respects: (1) Amit was an insider who obtained information as an employee, and (2) Mr. Bhiwapurkar willingly cooperated with the government and plead guilty rather than exercise his constitutional right to a jury trial, and (3) Amit profited more than Mr. Bhiwapurkar (as a result of investing more).  *See* Transcript of Bhiwapurkar Sentencing Hearing at 4:13-11:2 (Apr. 12, 2024) (ECF No. 124).  Notably, the Court also correctly noted that both Amit and Mr. Bhiwapurkar were tippees such that a distinction between the co-defendants on that basis could not be drawn.  *See id.* at 11:3-9.

As acknowledged by the Court at Mr. Bhiwapurkar's sentencing, however, "the greatest difference between the two of them is . . . that [Mr. Bhiwapurker] exhibited extraordinary

acceptance of responsibility by meeting with the government and providing information to the government." *Id.* at 11:12-20. In so doing, Mr. Bhiwapurkar was effectively waiving his constitutional right to a jury trial. Amit, on the other hand, exercised that constitutional right. The Court should not penalize Amit at sentencing for that decision by imposing a sentence significantly harsher than the sentence imposed on Mr. Bhiwapurkar. *See Bordenkircher v. Hayes,* 434 U.S. 357, 363 (1978) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort."); *United States v. Whitten*, 610 F.3d 168, 195-96 (2d Cir. 2010) (explaining that a sentencing court may grant leniency for cooperating but may not impose a harsher sentence based on a defendant's failure to plead guilty or failure to cooperate); *United States v. Saunders*, 973 F.2d 1354, 1362 (7th Cir. 1992) ("[U]nder the so-called unconstitutional conditions doctrine . . . a defendant may not be subjected to more severe punishment for exercising his or her constitutional right to stand trial." (citing *Minnesota v. Murphy*, 465 U.S. 420, 434 (1984)).

Judge Rakoff has clearly articulated that a defendant who proceeds to trial should not be sentenced to a more severe sentence than a defendant who pleads guilty:

> I also want to emphasize, though I'm sure counsel already appreciates this, I never penalize any defendant in any way, shape, or form for going to trial. That is a defendant's constitutional right. Frankly, I think it's a right that should be availed of in many more cases than it is. . . . My sentence will be essentially what the sentence would have been if [the defendant] had pled guilty.

Trial Transcript at 921:15-21, *United States v. Pinto-Thomaz*, No. 18-cr-579 (S.D.N.Y. Apr. 26, 2019) (ECF No. 139).

While Amit and Mr. Bhiwapurkar can be distinguished, these differences do not suggest that the Court should not impose a non-custodial sentence on Amit. For example, if the Court wishes to impose a more severe sentence on Amit than Mr. Bhiwapurkar, the probationary

sentence can be increased to include a period of home confinement and/or a longer duration of probation.

## VI.    **The Court Should Decline to Order Forfeiture and a Fine**

The Court should decline to enter a forfeiture order and fine in this case as Amit has been unemployed since June 2023, has a negative monthly cash flow, and is currently supported by his wife and their savings.  PSR ¶¶ 79, 85.  Amit also lost any profits he made from his purchase of Pfizer options on November 4, 2021 by further using them to feed his gambling habit.  GX 102 at 957-1016.  And, while Amit has been working to develop the healthcare business, he has not received any compensation for that work to date.  PSR ¶ 79.  Amit simply does not have the means to pay a forfeiture of any relatively significant amount, let alone $272,861.99.  A fine of $10,000 to be paid in monthly installments of $150.00, *see* PSR at 33, is also excessive in light of Amit's current and future financial conditions.

## CONCLUSION

For the foregoing reasons, Amit respectfully requests that the Court impose a non-custodial sentence of probation or home confinement.

Dated:  New York, New York
        July 12, 2024

Respectfully submitted,

/s/ *Patrick J. Smith*
Patrick J. Smith
Sean H. McMahon
Selbie L. Jason
CLARK SMITH VILLAZOR LLP
666 Third Ave, 21st Floor
New York, New York 10017
Tel: (212) 377-0850
patrick.smith@csvllp.com
sean.mcmahon@csvllp.com
selbie.jason@csvllp.com

*Attorneys for Defendant Amit Dagar*

58